**11-2867-ag**
*Jose Pretzantzin, et al. v. Holder*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: March 14, 2013    Decided: July 31, 2013)

Docket No. 11-2867-ag

_____

JOSE MATIAS PRETZANTZIN, AKA JOSE M. PRETZANTZIN-YAX, PACHECO PRETZANTZIN, AKA SANTOS RAMIRO PRETZANTZIN, PEDRO ESTANISLADO PRETZANTZIN, PEDRO LEONARDO PACHECO LOPEZ, JUAN MIGUEL PRETZANTLIN-YAX, AKA JUAN MIGUEL PRETZANTZIN-YAX,

*Petitioners,*

v.

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,

*Respondent.*[*]

_____

Before:
    WESLEY, DRONEY, *Circuit Judges,* NATHAN, *District Judge.*[**]

---

[*] The Clerk of Court is directed to amend the official caption to conform to the listing of the parties stated above.

[**] The Honorable Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

Petitioners appeal from the December 17, 2010 decision of the Board of Immigration Appeals (the "BIA") reversing the Immigration Judge's prior grant of Petitioners' motion to suppress evidence obtained in egregious violation of Petitioners' Fourth Amendment rights and terminate their removal proceedings. The BIA determined that evidence of Petitioners' identities was not suppressible under the Supreme Court's decision in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), and that, in any event, the Government had acquired independent evidence of alienage by obtaining Petitioners' birth certificates. Because we find that *Lopez-Mendoza* confirmed an existing jurisdictional rule, rather than announcing a new evidentiary rule, the BIA erred in concluding that the Government had met its burden of establishing that certain alienage-related evidence had been obtained independent of any constitutional violation. The Government having had the opportunity to show that the alienage-related evidence was obtained from an independent source, and having explicitly chosen not to do so, we **VACATE** and **REMAND** the BIA's decision with instructions to reach only the issue of whether Government agents seized evidence of alienage from Petitioners in the course of committing an egregious Fourth Amendment violation.

VACATED AND REMANDED.

———————————————

ANNE PILSBURY (Heather Y. Axford, *on the brief*), Central American Legal Assistance, Brooklyn, NY, *for Petitioners.*

MATTHEW GEORGE, Trial Attorney, Office of Immigration Litigation, Civil Division (Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Douglas E. Ginsburg, Assistant Director, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, DC, *for Respondent.*

Elaine J. Goldenberg, Matthew E. Price, Jenner & Block LLP, Washington, DC; Omar C. Jadwat, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, NY, *for*

_____

WESLEY, *Circuit Judge*:

In the early morning hours of March 5, 2007, Petitioner Pedro Estanislado Pretzantzin ("Estanislado Pretzantzin") awoke to a loud banging; he opened his third-floor bedroom window to see a group of armed, uniformed officers at his apartment building's front door in Jamaica, New York.[1] The officers were from the Department of Homeland Security ("DHS") and worked for Immigrations and Customs Enforcement ("ICE"). Estanislado Pretzantzin shared the apartment with members of his extended family, including Petitioners Jose Matias Pretzantzin, Pacheco Pretzantzin, Pedro Pacheco-Lopez ("Pacheco-Lopez"), and Juan Miguel Pretzantlin-Yax.[2] Through the open window, the officers informed Estanislado Pretzantzin that they were "the police" and ordered him

_____

[1] The factual record in this case is somewhat sparse because the Government declined to make an evidentiary proffer concerning the circumstances of Petitioners' arrests. The following facts are taken from Petitioners' testimony and supporting affidavits, which the agency found credible.

[2] Santiago Pretzantzin-Yax has since voluntarily left the United States; he is not a petitioner for purposes of this appeal.

downstairs to open the door. Estanislado Pretzantzin complied.

After confirming that he lived on the third floor, one of the officers led Estanislado Pretzantzin back upstairs and ordered him to allow the other officers inside. At no point during the encounter did the officers explain their presence, present a warrant, or request consent to enter the apartment. Once inside, ICE officers rounded up the remaining Petitioners, who were asleep in their beds, assembled them in the living room, and demanded to see their "papers." It appears that only Pacheco-Lopez – the sole Petitioner who had a passport – was able to comply with the officers' directive. The officers did not ask Estanislado Pretzantzin whether he had legal status in the United States before arresting him.

All Petitioners were handcuffed and transported to ICE facilities at 26 Federal Plaza, in New York City, where they were notified for the first time that they were in the custody of immigration officials. ICE officers interviewed Petitioners and told them to sign statements that were not read to them in English (which Petitioners speak minimally if at all); these statements were subsequently memorialized

4

on Form I-213s (Record of Deportable/Inadmissible Alien). Petitioners were released from custody later that afternoon and served with Notices to Appear, charging them with removability under Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as natives and citizens of Guatemala who had entered the United States without inspection.

Following consolidation of their proceedings, Petitioners appeared before Immigration Judge George T. Chew (the "IJ") and conceded that they were the individuals named in the Notices to Appear, but denied the charges of removability and moved to suppress the evidence against them and terminate their proceedings. Petitioners argued that they were entitled to the suppression of all statements and evidence obtained as a consequence of the nighttime, warrantless raid of their home under the Fourth and Fifth Amendments. In opposition, the Government argued, *inter alia*, that it possessed independent evidence of Petitioners' alienage. Specifically, the Government claimed that it had obtained Petitioners' Guatemalan birth certificates from the United States Embassy in Guatemala using Petitioners' names, and that it also had Petitioner Pacheco-Lopez's criminal

history report, arrest record, and fingerprint card from a 1994 theft of services conviction for subway-turnstile jumping.  The arrest report listed Guatemala as Pacheco-Lopez's birthplace.

The Government ostensibly relied on the admission in Petitioners' motion to suppress (indicating that Petitioners were related) and Pacheco-Lopez's arrest records (confirming that he was born in Guatemala) to target the United States Embassy in Guatemala for the birth certificate request.  In connection with Petitioners' birth certificates, the Government proffered a Federal Express delivery record label for a package sent from ICE's facilities at 26 Federal Plaza to the United States Embassy in Guatemala, but it did not submit a copy of the actual birth certificate request or any other evidence bearing on the package's contents.  Following Petitioners' testimony at a subsequent suppression hearing,[3] the IJ invited the Government to proffer a warrant, statements from the officers, or any other evidence to justify their intrusion into Petitioners' home.  The

---

[3] Pacheco-Lopez and Estanislado Pretzantzin were the only Petitioners to testify at the merits hearing.  The IJ found their testimony credible and declined to take additional testimony from the remaining Petitioners, concluding that it would be repetitive.

6

Government, however, declined to do so and explicitly disavowed any reliance on Petitioners' Form I-213s, choosing to rely instead on Petitioners' birth certificates and Pacheco-Lopez's arrest records as the sole evidence of alienage.

In June 2008, the IJ granted Petitioners' motion to suppress the Government's evidence of alienage and terminate the proceedings, finding that the nighttime, warrantless entry into their home and resulting arrests constituted an egregious violation of Petitioners' Fourth and Fifth Amendment rights. Having found Petitioners' testimony and supporting affidavits sufficient to establish a *prima facie* case for suppression, the IJ reasoned that the Government's failure to offer any justification for the conduct of its agents resolved the issue in Petitioners' favor. The IJ also rejected the Government's contention that Petitioners' birth certificates and Pacheco-Lopez's arrest records constituted independent evidence of alienage, finding that this evidence could only have been obtained through the use of evidence illegally procured as a result of the raid of Petitioners' home, namely, Pacheco-Lopez's passport and Petitioners' statements.

7

The Government appealed. In a December 17, 2010 order, the BIA vacated the IJ's decision. *In re Jose Matias Pretzantizin, et al.*, Nos. A097 535 298/296/297/299/300/301 (B.I.A. Dec. 17, 2010). Relying on *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), for the proposition that identity is never suppressible as the fruit of an unlawful arrest, the BIA found that it need not determine whether Petitioners suffered an egregious violation of their constitutional rights because their birth certificates and Pacheco-Lopez's arrest records were obtained after the Government had determined their identities. The BIA explained that Petitioners' birth certificates were obtained from Guatemalan authorities using Petitioners' insuppressible identities; the BIA offered no similar justification for the independence of Pacheco-Lopez's arrest records. Lastly, although the Government had expressly declined to rely on Petitioners' Form I-213s before the IJ, the BIA found this evidence admissible because Petitioners had not argued that their statements were "untrue or unreliable." *In re Pretzantizin*, A097 535 298, at 2.

Petitioners were subsequently ordered removed to Guatemala and have timely petitioned for review.

8

"The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." *Lopez-Mendoza*, 468 U.S. at 1040-41 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation – whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980) (internal citations omitted). Outside of the criminal context, however, the applicability of the exclusionary rule becomes less certain. *Lopez-Mendoza*, 468 U.S. at 1041.

---

[4] The standards of review here are neither contested nor determinative. We review only the decision of the BIA reversing the IJ's grant of suppression and termination, *see Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005), and review the agency's factual findings for substantial evidence and issues of law *de novo*. *See* 8 U.S.C. § 1252(b)(4)(B); *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 233-34 (2d Cir. 2006).

In *Lopez-Mendoza*, the Supreme Court held that a Fourth Amendment violation does not, standing alone, justify the suppression of evidence in the course of a civil deportation proceeding, *id.* at 1050; this Court has since interpreted *Lopez-Mendoza* to allow suppression following an *egregious* violation, *see Almeida-Amaral v. Gonzalez*, 461 F.3d 231, 235 (2d Cir. 2006). Today, as discussed in a companion case argued in tandem with the case at bar, *Doroteo Sicajau Cotzojay v. Holder*, No. 11-4916-ag, – F.3d –, – (2d Cir. 2013), we confirm what the BIA and other courts have already recognized: A nighttime, warrantless raid of a person's home by government officials may, and frequently will, constitute an egregious violation of the Fourth Amendment requiring the application of the exclusionary rule in a civil deportation hearing. *See Matter of Guevara-Mata*, No. A097 535 291 (B.I.A. June 14, 2011);[5] *Oliva-Ramos v. Att. Gen. of U.S.*, 694 F.3d 259, 279 (3d Cir. 2012).

In the instant case, the BIA did not reach the question of whether there was an egregious violation of the Fourth Amendment, but instead predicated its reversal of the IJ's

---

[5] Available at http://66.147.244.126/~centrbq3/wp-content/uploads/2012/04/BIA-decision-Guevara-Mata.pdf.

10

grant of suppression on a finding that Petitioners' birth certificates and Pacheco-Lopez's arrest records were independently obtained through the use of only their names. To reach this result, the BIA relied on *Lopez-Mendoza's* statement that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest," 468 U.S. at 1039 ("*Lopez-Mendoza's* identity statement").  The task then is to discern the meaning of this statement that "has bedeviled and divided our sister circuits."  *United States v. Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007).[6]  For the reasons that follow, we join the Fourth, Eighth, and Tenth Circuits in finding that *Lopez-Mendoza* reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific pieces of identity-related evidence from suppression.

---

[6] *See Oscar-Torres*, 507 F.3d at 228 (*comparing United States v. Olivares-Rangel*, 458 F.3d 1104, 1106 (10th Cir. 2006) (interpreting *Lopez-Mendoza* as merely reiterating long-standing jurisdictional rule), *and United States v. Guevara-Martinez*, 262 F.3d 751, 754-55 (8th Cir. 2001) (same), *with United States v. Bowley*, 435 F.3d 426, 430-31 (3d Cir. 2006) (interpreting *Lopez-Mendoza* as barring suppression of evidence of identity), *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (same), *and United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999) (same)).

11

*INS v. Lopez-Mendoza*

The jurisdictional nature of *Lopez-Mendoza's* identity statement is evidenced by both the context in which it was made and the authority upon which it relied. In *Lopez-Mendoza*, the Supreme Court reviewed challenges in two civil deportation proceedings, each of which were commenced following unlawful arrests. 468 U.S. at 1034. In the first proceeding, respondent Adan Lopez-Mendoza did not seek suppression of any specific piece of evidence and, instead, "objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest." *Id.* at 1040. The Supreme Court easily dispensed with Lopez-Mendoza's challenge to the validity of the proceedings against him because "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding." *Id.* (alteration in original and internal quotation marks omitted). It was in this context that the Supreme Court stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039 (citations omitted).

12

In the second proceeding, respondent Elias Sandoval-Sanchez moved to suppress his Form I-213 (Record of Deportable/Inadmissible Alien), which memorialized incriminating post-arrest statements relating to his immigration status and place of birth.  *Id.* at 1037-38, 1040; *Lopez-Mendoza v. INS*, 705 F.2d 1059, 1062 (9th Cir. 1983), *rev'd*, 468 U.S. 1032 (1984).  The Court observed that Sandoval-Sanchez had "a more substantial claim" because "[h]e objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding."  468 U.S. at 1040.  Accordingly, the Court considered whether the exclusionary rule should apply to prohibit the Government from using illegally obtained evidence of Sandoval-Sanchez's alienage against him in deportation proceedings.  *Id.* at 1040-41.  The Court ultimately found the exclusionary rule inapplicable in Sandoval-Sanchez's case after weighing the likely social benefits and costs pursuant to the framework established in *United States v. Janis*, 428 U.S. 433 (1976).  *Lopez-Mendoza*, 468 U.S. at 1050.

The Court's differing treatment of Lopez-Mendoza's personal jurisdiction challenge and Sandoval-Sanchez's evidentiary challenge, and the corresponding omission of any

13

identity-related considerations from the evaluation of the latter claim, show that *Lopez-Mendoza's* identity statement merely confirmed the jurisdictional rule that an unlawful arrest has no bearing on the validity of a subsequent proceeding; the Court did not announce a new rule insulating all identity-related evidence from suppression.  *See Oscar-Torres*, 507 F.3d at 228-29; *United States v. Olivares-Rangel*, 458 F.3d 1104, 1111 (10th Cir. 2006); *United States v. Guevara-Martinez*, 262 F.3d 751, 754 (8th Cir. 2001).  After all, if *Lopez-Mendoza's* identity statement – applicable to both criminal and civil proceedings, 486 U.S. at 1039-40 – was intended as a rule of evidence, it would have been impracticable for the Court to employ a cost-benefit analysis in deciding whether to apply the exclusionary rule to Sandoval-Sanchez's civil deportation proceedings without first determining whether the statements he sought to suppress were identity-related evidence.

The jurisdictional nature of *Lopez-Mendoza's* identity statement is further evidenced by the authorities it employed, which relate to the long-standing *Ker-Frisbie* doctrine – providing that an illegal arrest does not divest the trial court of jurisdiction over the defendant or

14

otherwise preclude trial.  *See id.* at 1039-40 (citing, *inter alia*, *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) and *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975)); *see also Olivares-Rangel*, 458 F.3d at 1110-11 (recognizing *Lopez-Mendoza's* identity statement as an application of the *Ker-Frisbie* doctrine); *accord Oscar-Torres*, 507 F.3d at 228-29. In *Ker v. Illinois*, the Supreme Court first considered the effect of an unlawful taking of custody on the validity of a subsequent proceeding; the Court concluded that due process was not violated when a defendant was kidnaped in Peru and forcibly returned to Illinois to stand trial.  119 U.S. 436, 438-40 (1886).  Due process did not restrict the methods employed to bring the defendant before the court; it governed what happened once he was there.  The Court reasoned that due process "is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled."  *Id*. at 440.

More than sixty years later, in *Frisbie*, the Supreme Court refused to depart from *Ker* when faced with a due process challenge by a defendant who was abducted in

15

Illinois and taken to Michigan for trial, noting that "[t]here is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."  342 U.S. at 522; *see also Gerstein,* 420 U.S. at 119 (declining to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction").  *Lopez-Mendoza's* reliance on the *Ker-Frisbie* line of authority in support of its identity statement leaves no doubt that the Court was referencing the long-standing jurisdictional rule that an unlawful arrest has no bearing on the validity of a subsequent proceeding rather than announcing a new rule insulating all identity-related evidence from suppression.

Contemporary case law confirms our view.  A jurisdictional reading of *Lopez-Mendoza's* identity statement is compelled by the Supreme Court's recent decision in *Maryland v. King,* 133 S. Ct. 1958 (2013).[7]  In *King*, the

---

[7] The Government raised *King* in a Rule 28(j) Letter for the purpose of demonstrating that Petitioners' birth certificates and Pacheco-Lopez's arrest records were independently obtained through their insuppressible identities.  However, we think that *King's* treatment of identity-related evidence resolves any doubt that *Lopez-Mendoza's* mandate is jurisdictional rather than evidentiary.

Supreme Court examined the inventory or booking search exception to the Fourth Amendment's warrant requirement and found that a criminal defendant was not subjected to an unreasonable search and seizure when a sample of his DNA was taken, pursuant to the Maryland DNA Collection Act, following a lawful arrest for a serious offense that was supported by probable cause. *Id.* at 1980. In reaching this result, the Court identified the legitimate government interest served by Maryland's DNA Collection Act as "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody," *id.* at 1970, and concluded that "[w]hen probable cause exists to remove an individual from the normal channels of society and hold him in legal custody, DNA identification plays a critical role in serving those interests," *id.* at 1971. Importantly, we note that the inventory or booking search exception to the Fourth Amendment's warrant requirement is not implicated on the facts of the case at bar because, unlike in *King*, Petitioners were not subjected to lawful arrests based on probable cause. Indeed, here the IJ explicitly found that

17

Petitioners' arrests constituted unlawful seizures under the Fourth Amendment.[8]

Still, we find *King's* description of identity-related evidence telling. In finding that "name alone cannot address [the government's] interest in identity," the Court noted that other relevant forms of identification include fingerprints, "name, alias, date and time of previous convictions and the name then used, photograph, Social

---

[8] The Government's Brief includes a parenthetical citation to *United States v. Adegbite*, 846 F.2d 834 (2d Cir. 1988), a case the Government referenced during oral argument, for the proposition that "the identity [specifically, the name] of defendants is not suppressible under the exclusionary rule." Resp. Br. at 15 (quoting *Adegbite*, 846 F.2d at 838-39). In *Adegbite*, this Court determined that "the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda*," 846 F.2d at 838 – a statement largely irrelevant to this appeal. Initially, given the Government's inadequate briefing regarding any potential application of the pedigree exception discussed in *Adegbite*, we consider the argument to be waived. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75-76 (2d Cir. 2001).

Regardless, we would deem the pedigree exception to be inapplicable; it is focused on protecting "basic information needed to facilitate the booking and arraigning of a suspect" from suppression as a result of a *Miranda* violation following a valid arrest. *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) (citing *United States v. Gotchis*, 803 F.2d 74, 78-79 (2d Cir. 1986) and *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112-13 (2d Cir. 1975)). The concerns inherent within the pedigree exception to *Miranda* violations – supplying incriminating but identifying information without being warned of the consequences – do not line up well with the circumstances of Petitioners' constitutional claim that they were seized in their home without consent and without probable cause. There is no reason to consider engrafting an exception to the protections of the Fifth Amendment onto Petitioners' Fourth Amendment claims.

18

Security number, or [DNA] profile." *Id.* at 1972. This broad concept of "identity," when read in conjunction with the Government's proffered interpretation of *Lopez-Mendoza's* identity statement as precluding the suppression of all identity-related evidence, would render the inventory or booking search exception to the Fourth Amendment's warrant requirement superfluous. After all, if DNA is identity-related evidence, and *Lopez-Mendoza* precludes the suppression of all identity-related evidence, then why bother to couch Maryland's DNA Collection Act within the booking exception at all? And if identity-related evidence includes fingerprints, and *Lopez-Mendoza* precludes the suppression of all identity-related evidence, then what are we to make of controlling precedent mandating the suppression of this insuppressible evidence? *See, e.g., Hayes v. Florida*, 470 U.S. 811, 816-17 (1985) (holding fingerprints properly suppressed when defendant was arrested without probable cause, taken to police station without consent, and detained and fingerprinted for investigatory purposes); *Taylor v. Alabama*, 457 U.S. 687, 692-93 (1982) (concluding that "[t]he initial fingerprints [] were themselves the fruit of petitioner's illegal arrest . . . ." (citation omitted)); *accord Davis v. Mississippi*, 394 U.S.

721, 727 (1969). Given such peculiar consequences, it is clear that we cannot read *Lopez-Mendoza's* identity statement as establishing a rule of evidence.

**Jurisdictional Identity Evidence is Not Suppressible**

Although *Lopez-Mendoza's* identity statement merely confirmed a long-standing rule of personal jurisdiction, that does not resolve the matter. *Lopez-Mendoza's* jurisdictional rule has unavoidable, practical evidentiary consequences.[9] Because an individual cannot escape a tribunal's power over his "body" despite being subject to an illegal seizure en route to the courthouse, he cannot contest that he is, in fact, the individual named in the charging documents initiating proceedings. *See United States v. Garcia-Beltran*, 389 F.3d 864, 868 (9th Cir. 2004). Thus, a person's "identity," insofar as necessary to identify the individual subject to judicial proceedings, is not suppressible on a purely practical level.

The obvious element of identity that falls within this

---

[9] The Government argues that one of these consequences is allowing Petitioners to "immunize themselves from the consequences of their continuing violation of law." Resp. Br. at 11. The Supreme Court's recent confirmation that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," alleviates any concerns we harbor with respect to this claim. *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (citing *Lopez-Mendoza*, 468 U.S. at 1038).

20

category is one's name.  In this case, Petitioners freely concede that they are the individuals charged in the Notices to Appear and they do not argue that their names should be suppressed following an egregious Fourth Amendment violation.[10]  A more difficult question is what other identity evidence, if any, is necessary to identify the individual for jurisdictional purposes, and is thus not suppressible on a purely practical level.  However, the Court need not reach that question because the Government repeatedly contends that the names alone were sufficient to obtain the additional evidence at issue.  Resp. Br. at 7-8, 22, 25.  There is no need to decide where identity ends and alienage begins.  Therefore, we will hold the Government to its position.

---

[10] The Government argues that even if this Court requires suppression of Petitioners' identity information, Petitioners will be required to admit or deny the allegations and charges in any future Notices to Appear pursuant to 8 C.F.R. § 1240.10(c), and that if they deny the charges, the Government may question them under oath and the agency may draw adverse inferences if Petitioners remain silent. Resp. Br. at 10-11 & 10 n.1.  The Government is correct that Section 1240.10(c) provides that an "immigration judge shall require the respondent to plead to the notice to appear," 8 C.F.R. § 1240.10(c), and that "under certain circumstances, an adverse inference may indeed be drawn from a respondent's silence in deportation proceedings," *Matter of Guevara*, 20 I. & N. Dec. 238, 241 (B.I.A. 1990).  However, as Petitioners point out, the BIA has also held that "silence alone does not provide sufficient evidence, in the absence of any other evidence of record at all, to establish a prima facie case of alienage."  *Id.* at 242.

21

**Independent Evidence**

The BIA determined that Petitioners' birth certificates constituted independent evidence of alienage because they were obtained solely through the use of Petitioners' insuppressible identities. In assessing whether evidence was independently obtained, we must determine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (internal quotation marks omitted). And where, as here, Petitioners have established a *prima facie* case for suppression, the Government must "assume the burden of justifying the manner in which it obtained the evidence." *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (B.I.A. 1988) (internal quotation marks omitted).

The Government maintained before the agency and at oral argument that ICE procured Petitioners' birth certificates using only their names. But the arguments of counsel are not evidence, *Matter of Ramirez-Sanchez*, 17 I. & N. Dec. 503, 506 (B.I.A. 1980), and the Government failed to make any evidentiary proffer demonstrating the basis for Petitioners' birth certificate request. Moreover, we note

22

that the Government's claim that the request was based on names alone was dubiously supported by only a Federal Express package label, but not by the actual letter ICE sent to the United States Embassy in Guatemala.  In addition, the Government's post-argument Rule 28(j) Letter stating that "it was proper for the government to use aspects of [Petitioners'] identity other than simply their names – such as birth date and even place of birth – to obtain their Guatemalan birth certificates," would appear to further undermine the Government's contention.  Given that the record before the IJ contained no evidence documenting the basis for Petitioners' birth certificate request, we find that the BIA erred by concluding that the Government had met its burden of establishing that Petitioners' birth certificates constituted independent evidence of alienage. *See Wong Sun*, 371 U.S. at 488; *Barcenas*, 19 I. & N. Dec. at 611.

The Government argues that it already possessed independent evidence of Pacheco-Lopez's alienage prior to any constitutional violation, in the form of his arrest records that were merely *linked* to him using his name, but the record is equally silent concerning the procurement of those records.  The Government relies on *Reyes-Basurto v.*

23

*Holder*, a non-precedential summary order in which we previously affirmed the denial of a motion to suppress evidence on this linkage rationale. *See* 477 F. App'x 788, 789 (2d Cir. 2012). In *Reyes-Basurto*, the petitioner sought to suppress his Border Patrol records and a Form I-140 (Petition For Alien Worker) that were necessarily *already* in the possession of immigration officials. *See id.* at 789. In affirming the denial of suppression, we reasoned that Reyes-Basurto's pre-existing immigration records made him "a 'suspect' in regards to removability even before his [illegal] arrest." *Id.* at 789 (analogizing to *Crews*, 445 U.S. at 476, in which the Court declined to suppress an in-court witness identification because "the robbery investigation had already focused on [Crews], and the police had independent reasonable grounds to suspect his culpability" prior to any Fourth Amendment violation).

This rationale does not apply with equal force to Pacheco-Lopez, whose alienage-related evidence was in the possession of a municipal transit police department rather than immigration officials. *See Davis*, 394 U.S. 721; *see also Crews*, 445 U.S. at 476 ("Had it not been for Davis' illegal detention, however, his prints would not have been obtained and he would never have become a suspect."). In

any event, given that the Government failed to proffer any evidence demonstrating how Pacheco-Lopez's records were obtained, we are unable to find that this evidence was linked to him through the use of his name alone, and, therefore, we find that the BIA erred in concluding that the Government had met its burden of establishing that this evidence was independent of any constitutional violation.

## Conclusion

For the foregoing reasons, the decision of the Board of Immigration Appeals is hereby VACATED and REMANDED. Because the BIA declined to answer the question of whether Petitioners sustained an egregious Fourth Amendment violation, we do not reach this issue. However, we note that fact-finding with respect to the circumstances under which ICE officers entered Petitioners' home and seized Petitioners has been completed. The Government had an opportunity to respond to Petitioners' *prima facie* case for suppression and explicitly chose not to. Likewise, the Government had an opportunity to submit proof showing exactly how it obtained Pacheco-Lopez's arrest records and Petitioners' birth certificates. The Government failed to

25

do so; the evidence proffered is inadequate to support the Government's claim that it relied on Petitioners' names alone in securing their birth certificates from the United States Embassy in Guatemala.

Accordingly, we remand this case for the BIA to reach the issue of whether Government agents seized evidence of alienage from Petitioners in the course of committing an egregious Fourth Amendment violation.  Should any questions over the nature of the constitutional violation linger, we direct the agency to the opinion issued in a companion case also decided today, which found an egregious constitutional violation on facts very similar to those in this case.  *See Doroteo Sicajau Cotzojay v. Holder*, No. 11-4916-ag, – F.3d –, – (2d Cir. 2013).