**11-4916-ag**
*Doroteo Sicajau Cotzojay v. Holder*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

––––––––––––––––––––

August Term, 2012

(Argued: March 14, 2013    Decided: July 31, 2013)

Docket No. 11-4916-ag

––––––––––––––––––––

DOROTEO SICAJAU COTZOJAY,

*Petitioner*,

v.

ERIC H. HOLDER, JR.,
UNITED STATES ATTORNEY GENERAL,

*Respondent*.

––––––––––––––––––––

Before:

WESLEY, DRONEY, *Circuit Judges,* NATHAN, *District Judge*.[*]

Petitioner Doroteo Sicajau Cotzojay ("Sicajau") appeals from the October 31, 2011 decision of the Board of Immigration Appeals (the "BIA") dismissing Sicajau's appeal from the Immigration Judge's (the "IJ") July 17, 2009 order of removal and the IJ's April 21, 2009 oral decision denying

––––––––––––––––––––

[*] The Honorable Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

Sicajau's motion to suppress the Government's evidence of alienage. Immigration and Customs Enforcement ("ICE") officers obtained this evidence during an April 2007 nighttime, warrantless raid on Sicajau's home. The IJ denied Sicajau's motion to suppress after finding that Sicajau had not shown that ICE officers entered his home without consent and that, regardless, the ICE officers' conduct was not sufficiently "shocking" to qualify as egregious and require application of the exclusionary rule in this civil removal proceeding. The BIA affirmed the denial of Sicajau's motion to suppress and the subsequent order of removal. Because we find that the IJ erroneously interpreted our case law to require physical threat or harm before a Fourth Amendment violation becomes sufficiently egregious to require suppression, and thus erred by refusing to shift the burden of proof to show consent to the Government, we **VACATE** and **REMAND** the BIA's decision affirming the IJ's denial of Sicajau's motion to suppress and order of removal.

VACATED AND REMANDED.

_____

HEATHER Y. AXFORD (Anne Pilsbury, Alexandra Goncalves-Peña, *on the brief*), Central American Legal Assistance, Brooklyn, NY, *for Petitioner.*

NICOLE THOMAS-DORRIS, Trial Attorney, Office of Immigration Litigation, Civil Division (Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Mary Jane Candaux, Assistant Director, *on the brief*), United States Department of Justice, Washington, DC, *for Respondent*.

Nancy Morawetz, Nikki Reisch, Legal Intern, Washington Square Legal Services, Immigrant Rights Clinic, New York, NY, *for Amici Curiae Lutheran Social Services of New York, Families for Freedom, New Sanctuary Coalition of New York City.*

_____

WESLEY, *Circuit Judge*:

On April 16, 2007, at approximately 4:00 a.m., Petitioner Doroteo Sicajau Cotzojay ("Sicajau")[1] awoke to hear people knocking on windows and doors at the duplex that he shared with approximately twenty people in Riverhead, New York.[2] The individuals surrounding Sicajau's home identified themselves as police or probation officers and asked to speak with a man named Jose Cojon ("Cojon"). The "officers" were Immigration and Customs Enforcement ("ICE") officers. Sicajau observed Cojon (who lived in the next room) leave the house with his passport. The door to the house then closed behind him. Sicajau remained in his bedroom on the first floor of the house with his door locked. He heard steps on the first floor and then heard people pounding on his bedroom door. Fearing that officers would force their way into his room, Sicajau opened the door. Armed ICE officers entered the room, placed Sicajau

---

[1] Petitioner's attorney refers to him as "Sicajau."

[2] The factual record in this case is limited to Sicajau's affidavit and testimony before the IJ and the testimony of one of his neighbors, Jose Anibal Ochoa. The Government did not submit any affidavits or witnesses directly addressing the circumstances of Petitioner's arrest.

in handcuffs and took him to the living room, where he was searched and instructed to remain on the floor.

The officers asked Sicajau for identification and rejected his high school identification card – Sicajau had recently turned twenty years old. They then took him back to his bedroom and searched through the contents of his drawers until they located his Guatemalan passport. ICE officers loaded Sicajau and the majority of the people who lived at the duplex into a van. The officers drove the van to another house where they arrested several more people before proceeding to a McDonald's, where the officers had breakfast; the officers told Sicajau and the detainees in the van they could relieve themselves in the restaurant parking lot if the need arose.

ICE officers took Sicajau to 26 Federal Plaza in New York City and placed him in a cell. He was given a sandwich and a bottle of water. Subsequently, officers took Sicajau's photograph and his fingerprints before questioning him in English (which he does not speak well) about his immigration status and asking him to sign numerous documents. Sicajau was told he "could be in even bigger problems" if he didn't sign the documents. Joint App'x 149-

4

50. After Sicajau complied and officers completed a Form I-213, the Record of Deportable/Inadmissible Alien, ICE officers informed Sicajau that he had the right to an attorney. Sicajau was released at approximately 10:00 p.m. that evening.

**Prior Proceedings**

After the Government instituted removal proceedings, Sicajau filed a motion to suppress the Government's evidence of alienage, specifically, Sicajau's Guatemalan passport, the I-213 and the statements memorialized therein, and any other documents seized by, or statements made to, ICE officers. Sicajau argued that ICE officers obtained this evidence in violation of his Fourth and Fifth Amendment rights. Sicajau contended that ICE officers had "forcibly gained entrance" to his home and arrested him without a warrant or probable cause. *Id.* at 250. In support of his motion to suppress, Sicajau submitted a sworn statement. His affidavit asserted that he was "asleep in [his] bedroom" when he was "suddenly awoken at 4 A.M." by knocking at his window and voice yelling "'Police! Open up.'" *Id*. at 252. Regarding the officers' initial entry and exit from his home, Sicajau averred that he

5

> opened [his] bedroom door to see what was going on when [he] saw Jose Cojon leaving with a group of armed officers through the main door. After this [Sicajau's] sister in law closed and locked the front door. [Sicajau] returned to [his] bedroom.

*Id.* Sicajau's affidavit does not explain when or how the officers re-entered the home because he had "decided to stay in [his] room." *Id.*

In April 2009, Immigration Judge Robert D. Weisel (the "IJ") held a suppression hearing based on a "preliminary ruling that [Sicajau's] affidavit alone constituted prima facie evidence" sufficient to entitle Sicajau to a hearing. *Id.* at 100. However, the IJ was of the view that Sicajau's affidavit was "not in and of itself sufficient to establish that the right was violated." *Id.* The IJ viewed "the purpose of [the] hearing" as "provid[ing] [Sicajau] with the opportunity to testify. He has the burden to establish that there was a violation under the Constitution." *Id.* at 130.

During the hearing, Sicajau admitted that he "didn't see how [the officers] came in" when they returned, because he was in his bedroom, but he "heard the steps . . . how they were knocking and trying to get in." *Id.* at 151. Sicajau was able to testify to the fact that after Cojon

6

left the house, one of Sicajau's friends "closed the door . . . he locked it and closed it with some force."  *Id.* at 139.  During cross-examination, the attorney representing the Government inquired about the distinction between Sicajau's affidavit, in which he stated that his sister-in-law closed the door behind the officers, and his testimony, during which he said that a friend had shut the door.  *Id.* at 154.  Sicajau confirmed that he "saw [his] sister-in-law close the door, [he had] always said [his] sister-in-law and not [his] friends," but that his brother's subsequent deportation and the resulting estrangement between his brother and sister-in-law had left him concerned she would not testify on his behalf.  *Id.* at 155, 159-61.

Following Sicajau's testimony, his attorney called another resident of the house, Jose Anibal Ochoa ("Ochoa"), to testify.  Ochoa corroborated Sicajau's statements regarding what time officers arrived at the house.  At the time of the raid, Ochoa lived on the second floor of the residence.  He described the layout of the duplex and explained that each floor has its own entrance.  Although his testimony was not a model of clarity, the IJ and the parties agreed that Ochoa said that the home has an exterior

door that led to two doors, one opening onto the first floor and one at the top of a set of interior stairs opening onto the second floor.  Ochoa testified that the officers forced open the exterior door to gain access to the house.  Ochoa based this belief on the "banging" he heard and the fact that "no one opened the door for them." *Id.* at 190.  Ochoa did not see the officers enter the home.

The Government produced no witnesses.  Instead, the Government rested on an affidavit submitted by Darren Williams ("Williams"), a Supervisory Detention and Deportation Officer with the ICE New York City Fugitive Operations Team.  Williams did not participate in the raid on Sicajau's home; his affidavit offered nothing as to the acts of officers who did.  Instead, he explained the purpose of two Department of Homeland Security ("DHS") programs: Operation Return to Sender ("apprehending immigration absconders at large") and Operation Cross Check (finding and securing "aliens illegally in the United States, fugitive aliens, aliens with criminal records, or aliens posing a threat to the community").[3]  *Id.* at 229.  Williams confirmed

---

[3] Sicajau was arrested during a raid performed as part of Operation Cross Check.  The Petitioners in the companion case we decide today were seized as part of Operation Return to Sender. *See Jose Pretzantzin, et al. v. Holder*, No. 11-2867-ag, – F.3d –,

8

that operations were routinely scheduled to begin in the early morning – but never before 5:30 a.m. – and that officers were "explicitly trained that voluntary consent must be obtained from the occupant of the residence prior to making entry." *Id.* at 230-31. Williams stated that officers could question and, if warranted, detain non-target individuals who were encountered during an operation.

The IJ denied Sicajau's motion to suppress in an oral decision. The IJ recognized that this Court considers exclusion to be appropriate if an "an egregious violation occurred that was fundamentally unfair or [if] the violation, regardless of its egregiousness or fairness, undermined the reliability of the evidence in dispute." *Id.* at 109 (citing *Almeida-Amaral v. Gonzalez*, 461 F.3d 231 (2d Cir. 2006)). The IJ accurately described the testimony given by Sicajau and Ochoa. However, the IJ concluded that although the ICE officers' conduct was "not courteous, and was imperfect, and was disrespectful," *id.* at 211, Sicajau had not shown that it constituted an egregious Fourth Amendment violation that mandated suppression of alienage evidence obtained during the raid and at 26 Federal Plaza, *id.* at 110.

---

– (2d Cir. 2013).

The IJ determined that Sicajau had failed to "offer sufficient facts to establish that the residence was searched without valid consent," because "[n]either [Sicajau] nor [Ochoa] observed any official enter the dwelling." *Id.* at 108. The IJ further noted that Sicajau's testimony at the hearing varied somewhat from the statements in his affidavit, but the IJ did not appear to give much weight to the discrepancy regarding whether it was Sicajau's sister-in-law or his friend who closed the door behind Jose Cojon.[4] The IJ did not make an explicit finding as to whether he found Sicajau or Ochoa to be credible. Regardless, the IJ determined that even if ICE officers had entered Sicajau's home without a warrant and without

_____

[4] The IJ seemed more concerned with Sicajau's description of when and how the door to the home was initially opened and closed. In Sicajau's affidavit, he stated that he opened his bedroom door to see what was happening; he observed Cojon leave the home. "After this [his] sister in law closed and locked the front door." Joint App'x 252. During the hearing, Sicajau testified that he left his bedroom for a moment and, through a window, observed Cojon leaving the house. The attorney representing the Government asked Sicajau whether, when he was out of his room, he saw any doors standing open. *Id.* at 154. Sicajau responded that the doors were closed. *Id.* The Government's attorney then asked Sicajau how he knew that his sister-in-law had closed the door if he never saw it open. *Id.* at 155. Sicajau clarified that he had seen the door open before his sister-in-law closed it. *Id.* Although the IJ apparently viewed Sicajau's statements as containing a "marked contrast," *id.* at 108, whether Sicajau actually observed the exterior door standing open before his sister-in-law closed it or whether he merely presumed it had been open because he had just seen Cojon depart is not crucial given that Sicajau maintained that the doors were closed after Cojon left the house.

10

consent, that fact alone did not yield an egregious Fourth Amendment violation.  Because Sicajau was not subjected to physical brutality and was not threatened in a way that "would give him the impression that if he did not comply or obey [the officers'] requests, that he would be in some way severely mistreated, mishandled or punished," the IJ reasoned that the ICE officers' conduct was not sufficiently egregious to warrant application of the exclusionary rule in a civil removal hearing.  *Id.* at 110-11.  As a result, the IJ refused to suppress any of the evidence or statements obtained by the Government.  In July 2009, the IJ ordered Sicajau removed from the United States.

The Board of Immigration Appeals (the "BIA") affirmed. *In re Sicajau Cotzojay*, No. A097 535 383 (B.I.A. Oct. 31, 2011).  The BIA determined that the IJ was not required to suppress the Government's evidence of Sicajau's alienage because "the 'egregiousness' standard ha[d] not been met." *Id.*  The BIA reasoned that "[t]he facts as alleged by [Sicajau] [we]re insufficient to show that the immigration officers entered his living space without consent"; the BIA emphasized Sicajau's failure to produce a witness who saw the officers enter the building.  *Id.*  The BIA approved of the IJ's "observations that [Sicajau] did not show that he

11

was physically mishandled or threatened with harm," and it found that any Fourth Amendment violation was insufficiently severe to require application of the exclusionary rule. *Id.* The BIA also rejected Sicajau's arguments regarding alleged violations of his Fifth Amendment rights and of DHS regulations. *Id.*

Petitioner timely petitioned for review of the BIA's decision.

**Discussion**[5]

The IJ provided two bases for his decision that the evidence at issue was not suppressible: first, Petitioner failed to establish a lack of consent; and second, even if the raid was non-consensual, Petitioner failed to establish an egregious violation of his Fourth Amendment rights. The BIA affirmed both of the IJ's decisions. For the reasons discussed below, the Court concludes that the IJ erred on

---

[5] The standard of review is neither contested nor determinative. "When the BIA does not expressly 'adopt' the IJ's decision, but 'its brief opinion closely tracks the IJ's reasoning,' this Court may consider both the IJ's and the BIA's opinions 'for the sake of completeness.'" *Zaman v. Mukasey*, 514 F.3d 233, 237 (2d Cir. 2008) (quoting *Wangchuck v. DHS*, 448 F.3d 524, 528 (2d Cir. 2006)). We review the agency's factual findings for substantial evidence, *id.*, and questions of law *de novo*, *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000).

both levels.  It was error to find that Sicajau's submissions were insufficient to shift the burden to the Government to establish consent.  It was also error to conclude that the facts alleged, even accepted as true, were insufficient to yield an egregious Fourth Amendment violation requiring suppression.

**Burden of Proof**

The IJ first found that the evidence was not subject to exclusion because Sicajau failed to establish that the residence was searched without valid consent.  This was error; Sicajau adequately established a *prima facie* case for suppression, at which point it became the Government's burden to establish that its agents secured consent prior to conducting the search.  Pursuant to BIA precedent, a petitioner raising a question about the admissibility of evidence "must come forward with proof establishing a prima facie case before the [Government] will be called on to assume the burden of justifying the manner in which it obtained the evidence."  *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (B.I.A. 1988) (quoting *Matter of Burgos*, 15 I. & N. Dec. 278, 279 (B.I.A. 1975)).  Under this burden-shifting framework, if the petitioner offers an affidavit that "could support a basis for excluding the evidence in

13

question," it must then be supported by testimony. *Id.* If the petitioner establishes a *prima facie* case, the burden of proof shifts to the Government to show why the evidence in question should be admitted.

The BIA developed this burden-shifting framework in *Matter of Tang*, 13 I. & N. Dec. 691, 692 (B.I.A. 1971), a case in which the respondent challenged the Government's use of documents that his attorney claimed had been taken in violation of his constitutional rights. Tang's attorney did not provide any specifications regarding this assertion; he argued that "since he raised a question as to the legality of the evidence, the burden is upon the [Government] to come forward with proof establishing that the documents" were legally obtained. *Id*. The BIA disagreed, finding that "[o]ne who raises the claim must come forward with proof establishing a prima facie case before the [Government] will be called upon to assume the burden of justifying the manner in which it obtained its evidence." *Id.*

The BIA explained that the "reason for [its] rule" was that an "'attorney demanding suppression merely upon his own say-so often discovers only at the hearing that he has been misled by unsworn representations of his clients,'" resulting in protracted and unnecessary proceedings. *Id.*

14

(quoting *United States v. Garcia*, 272 F. Supp. 286, 290 (S.D.N.Y. 1967)). Thus, a "respondent's offer of proof" in support of a motion for suppression that is merely "a mixed legal and factual declaration by counsel, not based on counsel's personal knowledge and never corroborated personally by the respondent" does not constitute a *prima facie* showing. *Matter of Ramirez-Sanchez*, 17 I. & N. Dec. 503, 505-06 (B.I.A. 1980). But the requisite "personal knowledge" refers to information possessed by the respondent who was subject to the alleged constitutional violation; it cannot extend to information the respondent does not have.

Here, the IJ erred by failing to shift the burden to show consent from Sicajau to the Government once Sicajau offered an affidavit and supporting testimony based on personal knowledge sufficient to make out a *prima facie* case for suppression. Sicajau presented facts that, "if true, could support a basis for excluding the evidence in question." *Barcenas*, 19 I. & N. Dec. at 611. Although neither Sicajau nor Ochoa personally observed ICE officers enter their home, each man testified to the full extent permitted by his "personal knowledge." Despite this, the IJ found that Sicajau "d[id] not offer sufficient facts to establish that the residence was searched without valid

15

consent," because neither he nor his witness had "observed any official enter the dwelling." Joint App'x 108. The BIA affirmed this conclusion, finding that "[t]he facts as alleged by [Sicajau] are insufficient to show that immigration officers entered his living space without consent." *In re Sicajau Cotzojay*, No. A097 535 383 (B.I.A. Oct. 31, 2011).

This was error. Sicajau presented facts that, taken as true, showed that ICE officers entered his home without consent and in violation of the Fourth Amendment. *See Almeida-Amaral v. Gonzalez*, 461 F.3d 231, 237 (2d Cir. 2006) (noting that we must "tak[e] the evidence most favorably to petitioner" at this stage). At this point, the burden to establish that the officers obtained voluntary consent before invading Sicajau's home and bedroom should have shifted to the Government. However, the IJ believed that *even if* Sicajau had made a *prima facie* case for an ordinary Fourth Amendment violation (by establishing a non-consensual entry), he had not made a *prima facie* showing for suppression because the facts alleged could not yield a violation "so shocking to the conscience that it would rise to the level of egregiousness." Joint App'x 110.

**"Egregious" Fourth Amendment Violations**

The IJ also found, and the BIA affirmed, that the evidence was not subject to exclusion because Sicajau could not show an egregious Fourth Amendment violation requiring suppression. Specifically, the IJ found that even if Sicajau had demonstrated an ordinary Fourth Amendment violation, because he did not claim that ICE officers physically threatened or harmed him in the course of the nighttime, warrantless raid, it did not amount to an egregious violation. The IJ's determination, and the BIA's affirmation, rested on an erroneous view of what government conduct is required before a Fourth Amendment violation may be classified as egregious.

In *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), the Supreme Court balanced the "likely social benefits of excluding unlawfully seized evidence against the likely costs," *id.* at 1041, and determined that a Fourth Amendment violation, standing alone, does not justify applying the exclusionary rule in civil deportation hearings, *id.* at 1041-50. However, a plurality of the Court included two caveats to this rule.[6] First, Justice O'Connor, who

[6] *Cf. Oliva-Ramos v. Att. Gen. of U.S.*, 694 F.3d 259, 271 (3d Cir. 2012) ("[T]hough technically correct to characterize the

17

authored the majority opinion, recognized that the need for the exclusionary rule's use "might change, if there developed good reason to believe that Fourth Amendment violations by [immigration] officers were widespread." *Id.* at 1050. Second, Justice O'Connor limited the majority holding by exempting from it any "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050-51. Sicajau focuses his attack here on the second limitation: egregious Fourth Amendment violations.[7]

We interpreted this aspect of *Lopez-Mendoza* as authorizing the exclusion of evidence obtained in violation of the Fourth Amendment "if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation

portion of the majority opinion recognizing a potential exception to the Court's holding as a 'plurality opinion,' eight Justices agreed that the exclusionary rule should apply in deportation/removal proceedings involving egregious or widespread Fourth Amendment violations.").

[7] We note that recently ICE settled a class action arising out of warrantless invasions of (alleged) alien residences in conjunction with Operation Return to Sender. Mark Hamblett, *Settlement Includes Guidelines for ICE Raids*, N.Y. LAW JOURNAL, Apr. 8, 2013 (discussing settlement reached in *Aguilar v. Immigration and Customs Enforcement*, No. 07 Civ. 8224, before Southern District of New York Judge Katherine Forrest).

– regardless of its egregiousness or unfairness – undermined the reliability of the evidence in dispute."[8] *Almeida-Amaral*, 461 F.3d at 235. In *Almeida-Amaral*, the seventeen-year-old petitioner was approached late at night by a border patrol agent in the parking lot of a gas station near the Mexican border. *Id.* at 232. The agent requested identification; when the petitioner produced his Brazilian passport, the agent arrested him. *Id.*

This Court had no "doubts about the veracity of the evidence obtained as a result of the seizure," but questioned whether "the agent's stop of Almeida-Amaral transgressed notions of fundamental fairness." *Id.* at 235 (internal quotation marks and alteration omitted). Without providing an exhaustive set of factors, we identified "two principles that . . . bear on whether petitioner suffered an egregious violation of his constitutional rights." *Id.* at 235 & 235 n.1. First, the "characteristics and severity of

---

[8] *Almeida-Amaral* explained that "*Lopez-Mendoza* authorizes exclusion for violations that are egregious either because the violation 'transgress[ed] notions of fundamental fairness,' *or* because the violation 'undermine[d] the probative value of the evidence obtained.'" 461 F.3d at 234 (quoting *Lopez-Mendoza*, 468 U.S. at 1050-51) (emphasis in original). This Court viewed *Lopez-Mendoza's* use of the conjunctive "and" instead of the disjunctive "or" as apparently "inadvertent[]"; it was "plainly not what the Court intended" to require evidence of fundamental unfairness *and* diminished probative value to justify exclusion. *See id.* at 234-35.

19

the offending conduct," in addition to the validity of the seizure itself, should be considered. *Id.* at 235. Second, we determined that "even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)." *Id.* Applying these principles, we found that the agent's suspicionless stop was an infringement but was not egregious because the stop was neither severe nor apparently motivated by impermissible considerations. *Id.* at 237.

What causes a Fourth Amendment violation to qualify as "egregious" based on severity? This Court has never found a violation sufficiently severe, and therefore egregious, to require suppression in a removal hearing.[9] *E.g.*, *id.*; *Melnitsenko v. Mukasey*, 517 F.3d 42, 47-48 (2d Cir. 2008) (three-hour stop at a border check point was not sufficiently severe to be egregious); *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 131-32 (2d Cir. 2008) (per curiam)

---

[9] We have suppressed evidence on the basis of its unreliability. In *Singh v. Mukasey*, 553 F.3d 207 (2d Cir. 2009), immigration agents questioned the petitioner over several hours throughout the night, not about his own immigration status, a relatively clear-cut inquiry, but about "more nuanced" issues that were "susceptible to corruption during the course of an improper interview." *Id.* at 214-16.

(finding that petitioners were not "seized" for Fourth Amendment purposes when they answered officials' questions at an airport).  Other courts have identified egregious violations under arguably less severe circumstances.  *See*, *e.g.*, *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018-19 (9th Cir. 2008).  As the Third Circuit has noted, "there is no one-size-fits-all approach to determining whether a Fourth Amendment violation is egregious."  *Oliva-Ramos v. Att. Gen. of U.S.*, 694 F.3d 259, 279 (3d Cir. 2012).

In this case, the absence of physical threat or harm to Sicajau was a key factor in the IJ and BIA decisions finding the exclusionary rule inapplicable.  Determining whether an egregious violation must include the threat or realization of physical violence requires a review of the Supreme Court's Fourth Amendment jurisprudence generally, and the Court's reference to "egregious" violations in *Lopez-Mendoza* specifically.

First, it is uncontroversial that the Fourth Amendment applies to aliens and citizens alike.  *See*, *e.g.*, *Lopez-Mendoza*, 468 U.S. at 1046 (observing that it is "[i]mportant . . . to protect the Fourth Amendment rights of all persons," despite finding that application of the exclusionary rule is not necessary in every context).

21

Second, "in the absence of consent or exigent circumstances . . . [the Court has] consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. United States*, 451 U.S. 204, 211 (1981). The Fourth Amendment's protections apply to individuals like Sicajau, and these protections should be at their zenith in the home. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. N.Y.*, 445 U.S. 573, 589-90 (1980) (internal quotation marks and alterations omitted)).

But the applicability of the Fourth Amendment does not compel the availability of the exclusionary rule in civil deportation proceedings. *Lopez-Mendoza*, 468 U.S. at 1050. In support of the plurality's exception for egregious Fourth Amendment violations, Justice O'Connor looked to *Rochin v. California*, 342 U.S. 165 (1952), and to two BIA cases in which "fundamentally unfair" evidence was suppressed. *Lopez-Mendoza*, 468 U.S. at 1050-51 & 1051 n.5. In *Rochin*, a criminal case, when police officers entered the defendant's bedroom he promptly swallowed two unidentified capsules. 342 U.S. at 166. In order to recover the capsules, the

officers handcuffed Rochin and took him to the hospital, where his stomach was forcibly pumped to induce vomiting. *Id.* At Rochin's trial for possessing a preparation of morphine, the recovered capsules were the chief evidence against him. *Id.* After the California Supreme Court declined to review Rochin's conviction, the Supreme Court granted certiorari and reversed because the officers' conduct "shock[ed] the conscience." *Id.* at 209.

We do not read the Supreme Court's citation to *Rochin* as an indication that the Court requires equally flagrant violations before it is willing to label them "egregious." As the Third Circuit recently pointed out, the Supreme Court's decision in *Rochin* preceded its incorporation of the Fourth Amendment against the states via the Fourteenth Amendment in *Mapp v. Ohio*, 367 U.S. 643, 655-57 (1961). *Oliva-Ramos*, 694 F.3d at 276. "'Consequently, the Court has not relied on the *Rochin* shocks the conscience standard but has instead applied a Fourth Amendment reasonableness analysis in cases that, like *Rochin*, involved highly intrusive searches or seizures.'" *Id.* (quoting *Lester v. City of Chicago*, 830 F.2d 706, 711 (7th Cir. 1987) (additional internal quotation marks omitted)); *see also*

23

*Maryland v. King*, 133 S.Ct. 1958, 1969 (2013). Still, if a Fourth Amendment violation is measured by what is reasonable, then an egregious violation must surely be something more than unreasonable. *See Oliva-Ramos*, 694 F.3d at 276.

Justice O'Connor does not directly address what distinguishes an unreasonable violation from one that is egregious, but cites to two cases in which the BIA concluded that the constitutional violation at issue was egregious. One of these cases is directly on point, as it allowed "suppression of evidence obtained as a result of a night-time warrantless entry into the aliens' residence." *Lopez-Mendoza*, 468 U.S. at 1051 n.5 (citing *Matter of Ramira-Cordova*, No. A21 095 659 (Feb. 21, 1980)). She also cites to *Matter of Garcia*, 17 I. & N. Dec. 319, 321 (BIA 1980), in which the BIA invoked the "requirements of due process" to suppress the respondent's involuntary admission of alienage after his repeated requests for counsel were denied. *Lopez-Mendoza*, 468 U.S. at 1051 n.5.

Although both *Garcia* and *Ramira-Cordova*, like *Rochin*, involved some degree of physical threat or forcible contact, we are unconvinced that the Supreme Court's citation to these cases means that physical coercion is a necessary

24

component of an egregious Fourth Amendment violation. Ultimately, the plurality's exemption of egregious violations rests on the view that evidence obtained in a "fundamentally unfair" manner should be excluded for due process reasons. *Lopez-Mendoza*, 468 U.S. at 1051 n.5. We see no good reason to require that Fourth Amendment violations *must* involve some sort of physical threat or trespass before they "transgress notions of fundamental fairness." *Id.* at 1050-51 (noting that the evidence at issue was "gathered in connection with peaceful arrests"). Breaking into someone's home at 4:00 a.m. without a warrant or any legitimate basis need not also include physical injury or the threat thereof for such conduct to qualify as egregious.

In *Almeida-Amaral*, this Court explained that both the "characteristics and severity of the offending conduct," in addition to its validity or invalidity, are relevant. 461 F.3d at 235. This inquiry is intended to be broad. As the Third Circuit has recognized, "a flexible case-by-case approach" is warranted, under which the threat or use of physical force is one relevant, but not dispositive, consideration. *Oliva-Ramos*, 694 F.3d at 278-79. In *Oliva-Ramos*, the court vacated and remanded the BIA's decision

25

refusing to suppress evidence obtained via a pre-dawn, warrantless raid conducted as part of Operation Return to Sender. *Id.* at 279, 281 n.27. The Third Circuit developed a non-exhaustive list of factors to guide the BIA in its assessment of the egregiousness of the Fourth Amendment violation, including: whether the violation was intentional; whether the seizure was "gross or unreasonable" and without plausible legal ground; whether the invasion involved "threats, coercion[, ] physical abuse" or "unreasonable shows of force"; and whether the seizure or arrest was based on race or ethnicity. *Id.* at 279.

We agree with the Third Circuit that each of these factors, among others, may be useful for determining whether a Fourth Amendment violation is sufficiently egregious to require application of the exclusionary rule. No single aspect of a constitutional violation elevates its status from merely unreasonable to egregious.[10] Thus, although an

---

[10] The Ninth Circuit's view that "[a] Fourth Amendment violation is 'egregious' if 'evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a reasonable officer should [have known] is in violation of the Constitution'" goes too far. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008) (quoting *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994) (emphasis omitted)). This qualified immunity-type inquiry yields an exception that is "frankly, rather broad," *id.* at 1019 (Bybee, *J.*, concurring), and places too much emphasis on the good or bad faith of government agents.

unlawful search does not "become[] an egregious search merely because it invades the privacy of the home," *Martinez Carcamo v. Holder*, 713 F.3d 916, 923 (8th Cir. 2013), that government agents intrude into one's home (versus a workplace or vehicle, for example) is an important factor in assessing the egregiousness of a Fourth Amendment violation because the home is where its protections should be at their peak.  As in this case, the deliberate, nighttime, warrantless entry into an individual's home, without consent and in the absence of exigent circumstances, may constitute an egregious Fourth Amendment violation regardless of whether government agents physically threaten or harm residents.

We are persuaded that the facts as alleged by Sicajau portray an egregious Fourth Amendment violation requiring application of the exclusionary rule.  We reject the IJ's determination that Sicajau's failure to personally observe the officers' entry of the home rendered him incapable of establishing a *prima facie* case for suppression.  As discussed, Sicajau's affidavit and supporting testimony describing the circumstances of the raid were sufficient to carry this burden.  Thus, assuming that ICE officers did not secure voluntary consent to enter the home – thereby effecting the basic Fourth Amendment violation that must

27

underlie any egregious violation – certain aspects of the raid as alleged by Sicajau transform the constitutional transgression depicted here into an egregious Fourth Amendment violation.

Initially, we note that ICE officers purposely arrived at Sicajau's home in the pre-dawn hours, presumably for the purpose of startling the sleeping residents, and, perhaps, with the aim of coercing confused consent.[11] In addition, although the officers apparently secured their target, Cojon, they returned to the home without a warrant and without reasonable suspicion that additional illegal aliens remained behind the home's locked doors. The Government failed to offer any evidence showing that its officers obtained voluntary consent to enter the home; the only record of the raid that we have comes from Sicajau and Ochoa. In the absence of evidence to the contrary, their statements support finding that ICE officers entered the

_____

[11] According to Supervisory Detention and Deportation Officer Williams, ICE officers aim to arrive at residences between 5:30 a.m. and 6:00 a.m. "to ensure that target aliens would be present." Joint App'x 231. But the record in this case (and in the companion case argued in tandem with the case at bar) belies Williams' assertion that ICE officers never conduct raids starting before 5:30 a.m.

28

home without consent in egregious violation of the Fourth Amendment.[12]

We conclude that the best course is to remand for further proceedings to give the Government a meaningful opportunity to show that its officers obtained consent to enter Sicajau's home. We note that although Government proof of voluntary consent to enter Sicajau's home and bedroom would negate his Fourth Amendment claim, he has raised separate arguments regarding the admissibility of the evidence under the Fifth Amendment and DHS regulations. In light of our decision to remand, we decline to reach those arguments here. Finally, if, on remand, Sicajau's motion to suppress evidence of alienage is granted, we direct the IJ and the BIA to our opinion issued in a companion case also decided today for guidance with respect to what types of "identity" evidence are subject to exclusion. *See Jose*

---

[12] We believe that ICE officers' conduct throughout the raid lends support to our conclusion that the Fourth Amendment violation depicted here was egregious – the officers' actions were more than merely "disrespectful" with regard to the residents' constitutional rights. Specifically, ICE officers pounded on Sicajau's bedroom door, corralled Sicajau and other handcuffed residents in the living room, searched Sicajau's room for desirable identification documents, informed arrestees that they could relieve themselves in a restaurant parking lot while officers ate breakfast, and, in total, detained Sicajau for approximately eighteen hours.

*Pretzantzin, et al. v. Holder*, No. 11-2867-ag, – F.3d –, – (2d Cir. 2013).

## Conclusion

For the foregoing reasons, the decision of the Board of Immigration Appeals is hereby VACATED and REMANDED. On remand, the Government bears the burden of proof to show that ICE officers obtained voluntary consent to enter the home and Sicajau's bedroom.