10-3259(L)
Maldonado v. Holder

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: April 9, 2014     Decided: August 14, 2014)

Docket Nos. 10-3259(L), 10-3261, 10-3262, 10-3267, 10-3271, 11-1061, 11-1063, 11-1100, 11-3648, 11-3650

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ISAAC ANTONIO MALDONADO, JUAN ALBERTO BARRERA, JOSE RODOLFO CABRERA, JUAN CARLOS SIMBANACH, EDGAR ELADIO PREDROUAN,

Petitioners,

- v.-          10-3259(L), 10-3261, 10-3262, 10-3267, 10-3271, 11-1061, 11-1063, 11-1100, 11-3648, 11-3650

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,

Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:          KEARSE, JACOBS, and LYNCH, Circuit Judges.

Petitioners seek review of orders of the Board of Immigration Appeals

dismissing their appeals from decisions of the Immigration Judge and denying their motions to remand and reopen. The Immigration Judge denied Petitioners' motions to hold suppression hearings, to suppress evidence, and to terminate removal proceedings. Petitioners argue that (1) "egregious" violations of their Fourth Amendment rights require suppression or at least a suppression hearing; (2) even if the violations were not egregious, the involvement of local police implicates ordinary exclusionary principles, which a fortiori require suppression; (3) regulatory and subregulatory violations committed by federal agents warrant termination; and (4) the BIA erred in denying motions to remand and reopen based on additional evidence uncovered in Petitioners' separate civil rights suit. We deny the petitions for review.

Judge LYNCH dissents in a separate opinion.

MICHAEL J. WISHNIE, Supervising Attorney (Muneer I. Ahmad, Supervising Attorney; Alex Hemmer, Law Student Intern; Roberto Saldaña, Law Student Intern; Trinity Brown, Law Student Intern; on the brief), Jerome N. Frank Legal Services Organization, New Haven, CT for Petitioners.

ANDREW C. MACLACHLAN, Senior Litigation Counsel, Office of Immigration

Litigation, United States Department of Justice (Stuart F. Delery, Assistant Attorney General, Civil Division; Donald E. Keener, Deputy Director, Office of Immigration Litigation; on the brief), Washington, DC for Respondent.

DENNIS JACOBS, Circuit Judge:

Petitioners seek review of orders of the Board of Immigration Appeals ("BIA") dismissing their appeals from decisions of the Immigration Judge ("IJ") and denying their motions to remand and reopen. The IJ denied Petitioners' motions to hold suppression hearings, suppress evidence, and terminate removal proceedings. Petitioners argue that (1) "egregious" violations of their Fourth Amendment rights require suppression of evidence, or at least a suppression hearing; (2) even if the violations were not egregious, the involvement of local police implicates ordinary exclusionary principles, which a fortiori require suppression; (3) regulatory and subregulatory violations committed by U.S. Immigration and Customs Enforcement ("ICE") agents warrant termination; and (4) the BIA erred in denying motions to remand and reopen based on additional evidence uncovered in Petitioners' separate civil rights suit. We reject these arguments, and deny the petitions for review.

**I**

On September 19, 2006, Petitioners were among persons gathered in Kennedy Park, Danbury, Connecticut, to seek work as day laborers. That day, the Danbury Police Department ("DPD") and ICE were jointly conducting a sting operation in the area. Petitioners entered a nearby, unmarked vehicle driven by an undercover DPD officer, and were transported to a parking lot and arrested. During processing, Petitioners made incriminating statements about their alienage, which were memorialized on "Form I-213s" ("Record[s] of Deportable/Inadmissible Alien").[1] Petitioners were served with Notices to Appear, which alleged that they are natives and citizens of Ecuador and that they entered the United States without inspection.

Petitioners appeared before an IJ and moved to suppress their Form I-213s and to terminate removal proceedings. In January 2008, the IJ denied the motions and ordered Petitioners removed.

---

[1] "A Form I–213 is an official record routinely prepared by an [immigration officer] as a summary of information obtained at the time of the initial processing of an individual suspected of being an alien unlawfully present in the United States." Bauge v. INS, 7 F.3d 1540, 1543 n.2 (10th Cir. 1993). "Form I–213[s] . . . are records made by public officials in the ordinary course of their duties, and accordingly evidence strong indicia of reliability." Felzcerek v. INS, 75 F.3d 112, 116 (2d Cir. 1996).

4

Petitioners appealed to the BIA and also filed motions to remand, asserting that previously unavailable evidence demonstrated that they had been arrested by the DPD, not by ICE. In July 2010, the BIA dismissed the appeals and denied the motions to remand. In 2011, the BIA denied Petitioners' motions to reopen proceedings based on new evidence produced in their civil rights suit against ICE and Danbury's mayor. This consolidated appeal followed.

**II**

"When the BIA does not expressly adopt the IJ's decision, but its brief opinion closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." Zaman v. Mukasey, 514 F.3d 233, 237 (2d Cir. 2008) (internal quotation marks omitted). "We review the agency's factual findings for substantial evidence and questions of law de novo." Cotzojay v. Holder, 725 F.3d 172, 177 n.5 (2d Cir. 2013) (citations omitted).

**III**

Petitioners argue that suppression, or at least a suppression hearing, was required because of "egregious" violations of Fourth Amendment rights.

5

**A**

The exclusionary rule does not apply to civil deportation proceedings, in part because "a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more." INS v. Lopez-Mendoza, 468 U.S. 1032, 1034, 1039 (1984). The Court left open whether exclusion might nevertheless be required for unspecified "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness." Id. at 1050.

This Court has since answered the question left open in Lopez-Mendoza by holding that exclusion of evidence is appropriate if "record evidence establishe[s] . . . that an egregious violation that was fundamentally unfair had occurred." Almeida-Amaral v. Gonzales, 461 F.3d 231, 235 (2d Cir. 2006).[2] Almeida-Amaral

---

[2] Almeida-Amaral also explained that suppression is warranted if "the violation--regardless of its egregiousness or unfairness--undermined the reliability of the evidence in dispute." Id. at 235. Petitioners do not argue that any evidence obtained here is unreliable. See Singh v. Mukasey, 553 F.3d 207, 216 (2d Cir. 2009) ("In those immigration cases where we have affirmed the denial of suppression motions on the basis that the evidence was nonetheless reliable, the evidence related to simple, specific, and objective facts, e.g., whether a person is a foreign citizen or has a passport and valid visa. . . . [A] person either is or is not a citizen of a particular country and either does or does not have a visa.").

6

posited in dicta some features of egregious abuse: (1) "if an individual is subjected to a seizure for *no* reason at all, that by itself may constitute an egregious violation, but only if the seizure is sufficiently severe"; and (2) "even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)." Id. at 235. No egregious violation occurred in that case because "nothing in the record" suggested that the seizure was particularly "severe"; and petitioner "offer[ed] nothing other than his own intuition to show that race played a part in the arresting agent's decision." Id. at 236-37. The court, therefore, had no occasion to explore: (1) how severe an abuse must be to be egregious; (2) what it means for a stop to be "based on race"; and (3) what "other" considerations are "grossly improper."

What is clear, however, is that "egregious" by definition is very bad indeed, and that the Supreme Court contemplated only such abuses as "transgress notions of fundamental fairness." As we have explained, the test for egregiousness is *more* demanding than the test for overcoming qualified immunity. See Cotzojay, 725 F.3d at 183 n.10. The standard is therefore stringent, entails a shock to the conscience, and is rarely satisfied.

To warrant a hearing at which the petitioner can adduce evidence in support of suppression, he must do more than simply ask. In Cotzojay, we cited with approval the BIA's burden-shifting framework for adjudicating suppression motions in the deportation context: "if the petitioner offers an affidavit that 'could support a basis for excluding the evidence in . . . question,' it must then be supported by testimony. If the petitioner establishes a prima facie case, the burden of proof shifts to the Government to show why the evidence in question should be admitted." Id. at 178 (quoting Matter of Barcenas, 19 I. & N. Dec. 609, 611 (B.I.A. 1988)). That is no simple matter: An affidavit cannot support a basis for exclusion unless, if taken as true, it makes out an egregious constitutional violation. See id. The affidavit in Cotzojay satisfied this test, because it averred facts that were appalling under any standard: a "deliberate, nighttime, warrantless entry into an individual's home, without consent and in the absence of exigent circumstances." Id. at 183.

**B**

The affidavits in this case do not suggest egregious constitutional violations, and therefore "could [not] support a basis for excluding the evidence." Id. at 178.

8

The affidavits state, in sum and substance:

(1) Petitioner was in Kennedy Park on September 19, 2006 "to find work for the day";

(2) "[e]mployers drive to Kennedy Park in the mornings to hire people for short-term manual labor projects";

(3) a vehicle drove up to the park;

(4) "[t]he driver of the vehicle *did not appear to be looking for any specific individuals*" and instead "*looked like he would take for the job whoever approached him first*";

(5) Petitioner got in the car with some other individuals, thinking he was going to a job site;

(6) Petitioner and other passengers were driven to a parking lot, and pushed, handcuffed, and arrested by "law enforcement officers"; and

(7) Petitioner was questioned and processed at DPD headquarters, and then transported to Hartford and to Boston to enter deportation proceedings.

J.A. 26-27 (emphases added).  Two affidavits state that, of the 40-70 day laborers

9

who stand in the park, the "majority" or "most[]" are Latino. J.A. 503, 522. Some affidavits, though not all, state that the Petitioner was denied permission to use a phone for some period of days. See, e.g., J.A. 27.

Petitioners therefore aver only that they approached and entered the undercover vehicle without duress; they were self-selected; the driver did not appear to be looking for any specific individuals; and the driver seemed willing to take whoever got in first. These averments do not support a finding that an egregious constitutional violation occurred.

Petitioners do not allege that they were treated in a particularly severe manner. As the BIA explained:

> The respondent does not claim that he was subjected to physical abuse, threats, promises, denial of food or drink, or long hours of interrogation which prompted his admissions. In fact, the respondent's affidavit provides few details about his questioning by an immigration officer and omits such critical information as when and where the interrogation took place, the length of the interrogation, and the circumstances under which the respondent provided the information recorded on the Form I-213.

In re Isaac Antonio Maldonado, No. A98 300 507, at 3 (B.I.A. July 19, 2010).

Nor is there any other circumstance that can be fairly characterized as egregious. The group that was targeted was ostensibly assembled to offer

themselves for day labor, an occupation that is one of the limited options for workers without documents.[3] Bystanders and casual park visitors were excluded by no criteria other than self-selection. Nothing in Petitioners' account suggests that they were gathered by the authorities, let alone that they were selected by the authorities on the basis of race. They self-selected on the basis of their willingness to seek and accept day labor.

## C

The BIA adopted and employed the <u>Cotzojay</u> burden-shifting framework. See <u>In re Isaac Antonio Maldonado</u>, A98 300 507, at 1 (B.I.A. Aug. 30, 2011) ("[W]e held that because the respondent's affidavit, *even accepted as true,* would not form

---

[3] Petitioners argue that consideration of day-laborer status is grossly improper, citing a pair of Ninth Circuit decisions: <u>United States v. Manzo-Jurado</u>, 457 F.3d 928, 932, 937-38 (9th Cir. 2006), which concluded that suppression was appropriate in a criminal case because "appearance as a Hispanic work crew" was insufficient to support "reasonable suspicion" necessary for an investigative stop; and <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936 (9th Cir. 2011) (<u>en banc</u>), which held that solicitation of work is constitutionally-protected speech. Naturally, these cases say nothing about whether occupation may be considered in an immigration enforcement operation, or whether an officer may take into account that work as a day laborer is likely correlated with undocumented status, or whether such a consideration is "grossly improper" and an "egregious violation" of constitutional rights requiring suppression in a civil deportation proceeding. <u>Almeida-Amaral</u>, 461 F.3d at 235.

a basis for excluding the Form I-213 . . ., the [IJ] correctly denied the respondent's motions for a suppression hearing [and] for suppression . . . ." (emphasis added)). The agency correctly applied that framework and concluded that Petitioners did not meet the burden necessary to warrant a suppression hearing.

Petitioners argue that the BIA's burden-shifting framework, and the requirement of an affidavit swearing to facts that could support a finding of egregious misconduct, deprive them of due process. Since (they argue) much of the information material to egregiousness will not and could not be within their personal knowledge, a hearing is needed to explore the circumstances of the arrest and the motivations and attitudes of the officers who arrested them.

As this case illustrates: unless a petitioner is first required to submit an "affidavit that could support a basis for excluding the evidence," Cotzojay, 725 F.3d at 178 (internal quotation mark omitted), an evidentiary hearing would be required in every deportation proceeding. Every petitioner might assert a vaguely improper motivation. But few would know the source or substance of the tips and intelligence that led ICE agents to conduct a particular sting or stop

them specifically.[4]  The Supreme Court recognized this very problem in Lopez-Mendoza:

> The [agency] currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed. . . . *The prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings. . . . Fourth Amendment suppression hearings would undoubtedly require considerably more, and the likely burden on the administration of the immigration laws would be correspondingly severe.*

468 U.S. at 1048-49 (emphases added); cf. id. at 1039 ("The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.").

Petitioners were required to proffer affidavits based on personal knowledge that, taken as true, could support suppression.  Had their affidavits been sufficient, they would have had an opportunity to confirm those allegations in an evidentiary hearing.  The BIA created this framework to accommodate several important but divergent interests: the rights of petitioner, the realities and

---

[4] In this case, the source was local law enforcement, and the substance was that "Kennedy Park was . . . a location of aggressive day labor solicitation," In re Isaac A. Maldonado, No. A98 300 507, at 6 (Immig. Ct. Hartford, CT Jan. 31, 2008), and that "aliens with Warrants of Removal would be encountered in this group of day laborers," Maldonado Form I-213, J.A. 5.

constraints of field work in this area, and the purposes of our civil immigration

system:

> The [Lopez-Mendoza] Court . . . noted that litigating the conduct surrounding an arrest would impose an intolerable administrative burden on the immigration enforcement system. Given that officers may arrest several aliens per day, they cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest. Moreover, *deportation hearings, which depend on simplicity and efficiency, would become immensely complicated if testimony had to be heard on the detailed circumstances of each arrest*.

Rajah v. Mukasey, 544 F.3d 427, 447 (2d Cir. 2008) (emphasis added) (citations and

internal quotation marks omitted). We therefore reject Petitioners' constitutional

challenges to the agency's burden-shifting framework.

**D**

Even if one were to consider evidence submitted with Petitioners' affidavits,

rather than (as the agency requires) the affidavits alone, nothing here would

warrant a finding of egregiousness.

According to Petitioners, the evidence shows that *Brazilians* in a nearby

park were not targeted by the DPD and ICE. See Pet'rs' Br. at 6 ("The DPD never

targeted the city's better-assimilated Brazilian immigrant population, whose day

laborers congregated at a different local site."). This alleged disparity would seem

14

to refute rather than suggest race-based animus. In any event, the argument conflates "race" (the only "grossly improper consideration" posited in <u>Almeida-Amaral</u>) with "ethnicity" and "national origin." Thus Petitioners urge that ICE may not *consider* national origin, even in conjunction with other factors such as day laborer status and the general experience of local police in that location. Such a rule would in effect require ICE to stop only the specific individuals it already knows are here illegally, and render egregious (and therefore forbidden) ICE raids on sweatshops, forced brothels, and other settings in which illegal aliens are exploited and threatened--and much worse. "The demand for a precise account of exactly what happened in each particular arrest would plainly preclude mass arrests, even when the [agency] is confronted, as it often is, with massed numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in full compliance with all Fourth Amendment requirements." <u>Lopez-Mendoza</u>, 468 U.S. at 1049-50.

No system of immigration enforcement can run under these constraints.

**IV**

Petitioners respond that, even if they do not state "egregious" Fourth Amendment violations, the "ordinary" exclusionary rule should apply because they were arrested by local police officers, rather than by federal agents charged with enforcing immigration law.

However, Petitioners acknowledge that "ICE agents [were] on the scene," Pet'rs' Br. at 27; allege that "immigration officer[s]" took part in their arrests, J.A. 27; and seek termination of removal on the basis of those officers' violations of agency regulations, see Pet'rs' Br. at 72-82. By Petitioners' own account, ICE agents played a substantial role in the sting operation.

But whatever the role of ICE here, "[a] removal proceeding . . . is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry." Pinto-Montoya v. Mukasey, 540 F.3d 126, 130 (2d Cir. 2008) (per curiam) (internal quotation marks omitted). Petitioners fail to identify any authority applying the exclusionary rule in removal proceedings absent an egregious constitutional violation. There can be none: "[A] Fourth Amendment violation does not, standing alone, justify the suppression of evidence *in the course of a civil deportation proceeding*." Pretzantzin v. Holder, 736 F.3d 641, 646 (2d Cir.

16

2013) (emphasis added); see also Lopez-Mendoza, 468 U.S. at 1034 ("This litigation requires us to decide whether an admission of unlawful presence in this country made subsequently to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing. We hold that the exclusionary rule need not be applied in such a proceeding."); cf. United States v. Janis, 428 U.S. 433, 454 (1976) ("[W]e conclude that exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion. This Court, therefore, is not justified in so extending the exclusionary rule.").

Accordingly, Petitioners cannot rely on exclusionary principles drawn from the criminal context.

**V**

The agency also denied Petitioners' motions to terminate on the basis of alleged pre-hearing regulatory violations by ICE agents.

"[A]liens are not entitled to termination of their proceedings for harmless, non-egregious pre-hearing regulatory violations." Rajah, 544 F.3d at 448.

17

"[P]re-hearing regulatory violations are not grounds for termination, absent prejudice that may have affected the outcome of the proceeding, conscience-shocking conduct, or a deprivation of fundamental rights. . . . In the case of harmless, nonegregious, pre-hearing violations, termination would provide no benefit other than a windfall delay to the deportable alien." Id. at 447.

Petitioners argue that ICE violated 8 C.F.R. § 292.5(b), which provides a right to have retained counsel present during "examination[s]." As the agency determined, however, Petitioners do not actually assert that they *asked for* and were *denied* counsel during their examinations.[5] ICE is only required to *inform* aliens of the right to legal representation when an alien is placed into formal removal proceedings. See 8 C.F.R. § 287.3(c).

---

[5] No Petitioner alleges that he requested counsel *during or immediately prior to* an examination, or that he was denied such request. See 8 C.F.R. § 292.5(b) ("*Whenever an examination is provided for in this chapter*, the person involved shall have the right to be represented by an attorney or representative . . . ." (emphasis added)). Petitioner Barrera states only that, on the way to DPD headquarters, "I took out a cell phone and said I was going to call my family and a lawyer. The officer told me not to make any phone calls." J.A. 465. Similarly, Petitioner Predrouan states that, on the way to DPD headquarters, "I wanted to call my family to put me in touch with a lawyer, but an officer took away my cell phone." J.A. 504.

Petitioners also sought to terminate proceedings based on alleged violations of 8 C.F.R. § 287.8(b), which requires for detainment a "reasonable suspicion" that a person is in the United States illegally, and 8 C.F.R. § 287.8(c), which requires for arrest a "reason to believe" that a person is in the United States illegally. For the reasons discussed above, the BIA properly concluded that Petitioners failed to assert egregious violations of these provisions. See Rajah, 544 F.3d at 448.

Similarly, alleged non-egregious violations of *internal* agency rules do not support termination. Petitioners' reliance on Montilla v. INS, 926 F.2d 162, 169 (2d Cir. 1991), is misplaced. That case concerned regulatory violations by ICE *during* removal proceedings, and the rule for pre-hearing regulatory violations is different. See Rajah, 544 F.3d at 448.

**VI**

Finally, Petitioners argue that the BIA erred in denying their motions to remand and to reopen.

**A**

"The BIA has 'broad discretion' to deny a motion to remand grounded on new evidence." See Cao v. U.S. Dep't of Justice, 421 F.3d 149, 156 (2d Cir. 2005)

(quoting INS v. Doherty, 502 U.S. 314, 323 (1992)).

The BIA properly concluded that additional evidence regarding the DPD's role in Petitioners' arrests was immaterial. As discussed above, the heightened exclusionary rule applicable to civil deportation hearings would apply anyway, and Petitioners fail to demonstrate an egregious violation of constitutional rights with or without this evidence.

**B**

"A motion to reopen proceedings shall not be granted unless it appears to the [BIA] that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ." 8 C.F.R. § 1003.2(c)(1). "We review the BIA's denial of a motion to reopen for abuse of discretion." Melnitsenko v. Mukasey, 517 F.3d 42, 49 (2d Cir. 2008).

The BIA did not abuse discretion in denying the motions to reopen.[6] It reasonably determined that evidence of use of force during arrest was neither new nor previously unavailable: "[T]he circumstances surrounding the respondent's arrest, i.e., the amount of force used, the length of detention, and other details

[6] The BIA denied three motions to reopen on timeliness grounds, and two substantively identical motions on the merits. We need not consider the timeliness question, because we agree with the agency's decision on the merits.

20

regarding the respondent's detention and questioning, constitute facts which were known to him at the time and should have been described fully in the affidavit submitted in support of his motion to suppress." In re Isaac Antonio Maldonado, A98 300 507, at 2 (B.I.A. Aug. 30, 2011).

As to evidence regarding the purpose of the joint sting operation, the BIA determined that it was immaterial because it *weakened*, rather than supported, the claim that race, and not traffic safety, was the motivating factor for the arrests. See id. ("The depositions contain testimony indicating that the purpose of the law enforcement action was to take care of the safety issues of day laborers running into traffic to solicit work and that the undercover officer was to take only those day laborers whom he witnessed committing a traffic violation by running into the street to solicit work." (citations omitted)).[7] Traffic safety is a valid interest of police and while it sounds here a partial motive at best, it is not for courts to hold that this is a situation the police must tolerate, or that their motives for doing their job are subject to inquiry and review in this context. "[R]ecord support for a

---

[7] Petitioners' affidavits state that there were usually 40 to 70 day laborers waiting for work in Kennedy Park, see J.A. 503, and that the car they entered was idling "across the street," see J.A. 464, 485. These statements support the agency's conclusion that traffic safety was a motivating factor in the sting operation.

21

contrary inference--even one more plausible or more natural--does not suggest error." Siewe v. Gonzales, 480 F.3d 160, 168-69 (2d Cir. 2007).

# VII

The dissent defines down the purposefully tough standard of an *egregious* constitutional violation; assumes that any conduct short of egregious is thus court-approved; and erodes to nothing the requirement of an affidavit that could make out a prima facie case.

\* \* \*

The dissent complains that the holding of the majority opinion "rests on a cramped definition of egregiousness." Dissenting Opinion at 2. This is odd. There is no such thing as an *expansive* view of what is "egregious." Something egregious is by nature extreme, rare, and obvious. A "cramped" view (if that is the adjective chosen) is what the standard requires.

We conclude only that the conduct of immigration agents during the Danbury sting operation did not constitute an "egregious violation[] of Fourth Amendment or other liberties that might transgress notions of fundamental fairness." See Lopez-Mendoza, 468 U.S. at 1050. It does not follow (as the dissent

22

contends passim) that we thereby authorize or "condone" the measures used. Dissenting Opinion at 13. This is taken for granted in many contexts: a grant of qualified immunity does not license similar conduct, a refusal to find outrageous government misconduct does not commend the prosecution's tactics, dismissal of an incarcerated patient's Eighth Amendment claim does not prescribe malpractice, and a conclusion that a workplace was insufficiently hostile to support relief is not an approval of what went on.

By the same token, the conclusion that conduct is not egregious does not say, "keep up the good work." It is simply not our office to bless immigration enforcement techniques, or to grade them, or (short of egregiousness) to regulate them via the exclusionary rule. We need to decide only whether the conduct of the immigration agents was egregious.

*  *  *

In opining that an egregious constitutional violation requires suppression of evidence, the dissent focuses on the conduct of the Danbury police, and whether they acted egregiously, without even discussing the conduct of the ICE agents who played an active role in the sting. That is a radical flaw, because the only issue in this case is whether to suppress evidence in immigration proceedings.

See Janis, 428 U.S. at 454, 459-60 (rejecting "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer" and "hold[ing] that the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign"). "[C]ommon sense dictates that the deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by . . . a different sovereign." Id. at 457-58.

Among other errors in the dissent:

- The dissent duly recites as "settled law" the requirement that "the petitioner offer[] an affidavit that *could* support a basis for excluding the evidence in question." Dissenting Opinion at 6-7 (emphasis in Dissenting Opinion). Although that requires an affidavit swearing to facts that constitute a prima facie case, the dissent discounts the requirement by emphasizing the verb "could," and treating it as meaning "might or might not." Compare Cotzojay, 725 F.3d at 179, 183 (explaining that petitioner "presented facts that, taken as true, showed that ICE officers entered his

24

home without consent and in violation of the Fourth Amendment" and that "the deliberate, nighttime, warrantless entry into an individual's home, without consent and in the absence of exigent circumstances, may constitute an egregious Fourth Amendment violation").

● To obviate the affidavit requirement, the dissent looks to material *attached* to the affidavit or submitted afterward to the B.I.A.: news reports and discovery in a later civil suit that explore the motivations of Danbury policy-makers and the Danbury police. Based on these sources, the dissent states confidently that the only two things the police officers knew about Petitioners were that: (1) "they were willing to engage in casual labor"; and (2) "*presumably, that they appeared Hispanic*." Dissenting Opinion at 11-12 (emphasis added)**.** But the dissent leaves out a lot. The affidavits themselves reflect that the driver "did not appear to be looking for any specific individuals" but "looked like he would take for the job whoever approached him first," J.A. 26-27; and that only a "majority" of the people who "come to Kennedy Park to look for work every day . . . are Latino," J.A. 522. Omitted also are the observations of local law enforcement that "Kennedy Park was . . . a location of aggressive day labor solicitation," In re

25

Isaac A. Maldonado, No. A98 300 507, at 6 (Immig. Ct. Hartford, CT Jan. 31, 2008), and that "aliens with Warrants of Removal would be encountered in this group of day laborers," Maldonado Form I-213, J.A. 5.

- The dissent quotes our observation that a seizure "may qualify as 'egregious' if based on race or other 'grossly improper' considerations," Dissenting Opinion at 7 (quoting Almeida-Amaral, 461 F.3d at 235), and deduces that ICE may not consider ethnicity, race, or nationality when investigating illegal immigration on the part of (for example) Albanians, Koreans, Israelis, or Nigerians. As the dissent concedes, the egregiousness standard lacks any "precisely defined . . . boundaries." Dissenting Opinion at 7. Seizure of persons based on nationality, race, or ethnicity (or handicap or sexual orientation, for that matter) can no doubt rise to an egregious constitutional violation. But it is absurd to foreclose altogether the consideration of nationality in immigration enforcement.

- The dissent variously characterizes the impropriety here as targeting persons from Latin America (a continent of all races and many nationalities), or persons who are "Hispanic." But, as the dissent concedes, there was no blanket targeting of Latin Americans. The dissent observes

26

(something not in Petitioners' affidavits) that enforcement does not seem to have been "undertaken to control day laborers at [the] nearby [area of] Minas Carne, a different location that was more heavily frequented by the city's better-assimilated Brazilian immigrant population." Id. at 3-4. The dissent seems to be under the impression that this observation assists its argument. In fact, it refutes the idea that ICE was operating on the basis of race, or targeting persons from Latin America (of which Brazil is the largest country). Thus the wide-ranging hearings contemplated by the dissent would presumably explore the relative assimilation achieved by various immigrant groups seeking day labor in the several parks of Danbury. According to the dissent, only such an inquiry will ensure a sufficiently "*fair* system of immigration enforcement." Id. at 18 (emphasis in Dissenting Opinion).

● Because the dissent views as forbidden any consideration of ethnicity or nationality (here, Ecuadorean rather than Brazilian), the dissent would require a hearing to find "evidence regarding the intentionality of a violation, the officers' motivation in conducting the raid at issue, and whether the petitioner's race, or ethnicity were a motivating factor for the

27

governmental action," as to which a petitioner affiant could not swear in an affidavit. Id. at 9. Thus the dissent inverts the rule that no suppression hearing be conducted without an affidavit containing a prima facie case, and would instead require a hearing to see if there should be a hearing. And such a hearing would consider what the agent or agents might have been thinking (to see if there is a prima facie case)--as though a person would be unaware of being the victim of egregious misconduct. Lopez-Mendoza was concerned that the "prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of [deportation] proceedings," 468 U.S. at 1048; the dissent's proposal would make invocation of the rule a commonplace tactic.

## CONCLUSION

For the foregoing reasons, the petitions for review are denied.

GERARD E. LYNCH, Circuit Judge, dissenting:

As the majority correctly holds, a respondent in removal proceedings who seeks the suppression of evidence must come forward with a prima facie case of an egregious Fourth Amendment violation before the government will be required to justify the manner in which it obtained its evidence.[1] See Cotzojay v. Holder, 725 F.3d 172, 178 (2d Cir. 2013). The egregiousness inquiry, we have held, mandates a "flexible[,] case-by-case" approach, which turns on a non-exhaustive list of factors, including, among others, whether the seizure was without plausible legal ground or based on grossly improper considerations such as race or ethnicity. Id. at 182-83. Petitioners here have offered evidence that, if true, suggests that after a multi-year harassment campaign targeted at Danbury's Hispanic residents generally, and its Ecuadorian residents specifically, petitioners were arrested without plausible legal justification based solely on their ethnicity, national origin, and status as day laborers. Nevertheless, the majority denies petitioners an evidentiary hearing.

---

[1] In removal proceedings, it is obviously the respondent who seeks to suppress evidence. By the time these cases reach this Court on appeal, however, the alien subject to an order of removal is the petitioner, since he is petitioning for review of a final order of removal. For the sake of consistency, and in conformity with the usual usage of this Court's prior decisions, I shall refer to the alien seeking suppression as the petitioner.

1

Worse, the majority further holds that even if the petitioners had been given such a hearing, they could not have proven an egregious Fourth Amendment violation because, in the immigration context, law enforcement's reliance on petitioners' status as apparently Latino day laborers, when shuffled together with the supposed experience of local law enforcement and a free-floating governmental interest in traffic safety, was not grossly improper. That result threatens to deprive persons placed in removal proceedings of the basic level of fundamental fairness that the Constitution demands. Because the majority's nearly insuperable barrier to obtaining an evidentiary hearing rests on a cramped definition of egregiousness that is inconsistent with our precedent, I respectfully dissent.

I

I begin by emphasizing several record facts that the majority downplays. Around 6:30 in morning of September 19, 2006, Danbury police officers and detectives met with United States Immigration and Customs Enforcement ("ICE") agents at the Danbury Police Department headquarters to prepare for a sting operation at Danbury's Kennedy Park. The park, a frequent gathering spot for Danbury's Ecuadorian population, was also a site at which many persons

sought work as day laborers. The sting operation was the culmination of a multi-year effort to combat what some Danbury officials and residents viewed as a growing influx of undocumented immigrants. In 2004, for example, Danbury's mayor wrote to United States Customs and Immigration Services, explaining that Danbury was "attracting a large number of undocumented immigrants," and asked that "enforcement resources" be focused on the city. J.A. 35. The following year, Danbury's mayor reached out to Connecticut's then-Governor requesting an agreement under 8 U.S.C. § 1357(g), which would have allowed state or local police officers to enforce federal immigration law under the supervision of ICE officials. Those efforts were rebuffed.

Danbury officials then intensified the enforcement of local ordinances, targeting housing code violations and attempting to shutdown sporting events that were popular among many of the city's Hispanic residents. Local officials also increased their efforts to control the solicitation of day labor near Kennedy Park. Although the ostensible reason for this targeted enforcement was traffic safety, the record does not reflect that any such efforts were undertaken to control day laborers at nearby Minas Carne, a different location that was more heavily frequented by the city's better-assimilated Brazilian immigrant

3

population.

It was against that backdrop that on that September 2006 morning, a Danbury police officer, dressed as a contractor, drove to Kennedy Park in an unmarked car, where he was then approached by men soliciting work. Once several men entered the vehicle, under the misapprehension that they would be taken to a work site, the detective, without asking the men any questions, drove them to an abandoned parking lot where seven Danbury police officers and three ICE agents awaited them. As the men left the vehicle, they were surrounded by armed law enforcement officers, shouting "[Y]ou're under arrest." J.A. 523. The undercover police officer made two other such trips to Kennedy Park that day, resulting in the arrest of 11 men, five of whom are the petitioners in these consolidated cases.

Petitioners were driven to the Danbury Police Headquarters, where they were questioned, fingerprinted, and held in detention cells. Some were denied an opportunity to telephone their family to notify them of their whereabouts or to arrange for the assistance of counsel. Petitioners eventually made incriminating statements about their immigration status, were placed in removal proceedings, and ordered removed from the United States, having entered the country without

4

inspection.[2]

## II

In <u>INS v. Lopez-Mendoza</u>, 468 U.S. 1032 (1984), the Supreme Court held that generally, the exclusionary rule does not apply to removal proceedings. A bare majority of the Court reached that conclusion after balancing the deterrent effects of the exclusionary rule against the social costs of extending its application to civil removal proceedings. A plurality of the Justices limited the Court's holding, however, specifically noting that its balancing discussion did not govern "egregious" violations of the Fourth Amendment or other fundamental rights, or cases involving "widespread" Fourth Amendment violations by immigrations officials. <u>Id</u>. at 1050-51.

Although this Court has not yet had occasion to consider what might constitute "widespread" Fourth Amendment violations, we have since held that

---

[2] The majority complains that I focus on the conduct of the Danbury Police without detailing the actions of ICE agents. But those agents appear to have simply delegated the round-up of Kennedy Park day-laborers to the Danbury Police. Nor is this a case in which the suppression of evidence in immigration proceedings would have no deterrent effect on local police officers. The record makes clear that the Danbury officers were motivated not by the prospect of state criminal proceedings, but precisely by their desire to use federal immigration law against people like the petitioners. The majority's reliance on <u>United States v. Janis</u>, 424 U.S. 433 (1976) is therefore misplaced. Majority Op., <u>ante</u>, at 23-24.

evidence obtained by "egregious" Fourth Amendment violations may be suppressed in removal proceedings. See Almeida-Amaral v. Gonzales, 461 F.3d 231, 234 (2d Cir. 2006); see also Pinto-Montoya v. Mukasey, 540 F.3d 126, 131 (2d Cir. 2008) ("We have adopted the reservations of the Lopez-Mendoza plurality as part of the law of our circuit . . . .") (quotation marks omitted).

In order to accommodate the competing interests of the government in streamlined removal proceedings, while simultaneously guarding individuals against egregious Fourth Amendment violations, we have approvingly cited the BIA's burden-shifting framework. Under that framework, in removal proceedings, "a petitioner raising a question about the admissibility of evidence must come forward with proof establishing a prima facie case before the Government will be called on to assume the burden of justifying the manner in which it obtained the evidence." Cotzojay, 725 F.3d at 178 (internal quotation marks and brackets omitted). Then, "if the petitioner offers an affidavit that *could* support a basis for excluding the evidence in question, it must then be supported by testimony." Id. (internal quotation marks omitted; emphasis added). If the petitioner establishes a prima facie case, the burden then shifts to the government to show why the evidence in question should be admitted. Id. To suppress

6

evidence resulting from a Fourth Amendment violation, the movant must make a prima face showing of an egregious Fourth Amendment violation. See id. at 179. We have not precisely defined the boundaries of "egregious" violations, but it is clear that the concept is not limited to cases of physical abuse. "[E]ven where the seizure is not especially severe," it may qualify as "egregious" if based on race or other "grossly improper" considerations. Almeida-Amaral, 461 F.3d at 235.

## III

The panel opinion's fundamental flaw is its unwillingness to properly apply and respect the purposes of "the Cotzojay burden-shifting framework." Majority Op., ante, at 11. To be clear, I have no quarrel with that framework, which is settled law. Properly applied, the framework would serve to maintain the proper functioning of the nation's immigration enforcement system while protecting the constitutional rights of those who become ensnared in removal proceedings. First, removal proceedings are necessarily streamlined, and therefore do not carry all of the protections of criminal proceedings. See United States v. Lopez, 445 F.3d 90, 100 (2d Cir. 2006). As a general matter, suppression hearings, which are often "unnecessary, expensive, and protracted," Matter of Tang, 13 I. & N. Dec. 691, 692 (B.I.A. 1971), are problematic in that process. The

7

affidavit requirement ensures that a suppression hearing will not be convened because a petitioner's attorney has been misled by unsworn representations of his client. Id. Second, requiring the petitioner's testimony prior to shifting the burden of proof to the government adds an extra hurdle, ensuring that a full-fledged hearing is not triggered by a mere declaration that the petitioner was seized for no reason at all or based on a grossly improper consideration. Finally, the egregiousness standard itself, which is limited to conduct that "by definition[,] is very bad indeed," Majority Op., ante, at 7, ensures that evidentiary hearings and suppression will remain rare.

But the proper application of the burden-shifting framework also ensures that in cases where all of the facts that would prove egregiousness are not within the personal knowledge of the petitioner, the petitioner will have an adequate opportunity to secure such evidence. Thus, while establishing a prima facie case for suppression requires an offer of proof containing information personally corroborated by petitioner, that requirement "cannot extend to information the [petitioner] does not have," Cotzojay, 725 F.3d at 178.

We have rejected the view that Fourth Amendment violations require "physical injury or the threat thereof." Id. at 182. Instead, we have adopted a

8

non-exhaustive list of factors to guide that assessment, including "whether the violation was intentional; whether the seizure was gross or unreasonable and without plausible legal ground; . . . and whether the seizure or arrest was based on race or ethnicity." Id. (internal quotation marks omitted). Plainly, evidence regarding the intentionality of a violation, the officers' motivation in conducting the raid at issue, and whether the petitioner's race, or ethnicity were a motivating factor for the governmental action would not and could not be within the petitioner's knowledge at the prima facie stage. But such evidence would be critical to proving that their arrest was without plausible legal grounds or based on a grossly improper consideration, factors suggestive of an egregious Fourth Amendment violation. Id. Because removal proceedings must comport with basic notions of fundamental fairness, I cannot agree with the majority's conclusion that in order to obtain an evidentiary hearing, petitioners must personally attest to first-hand knowledge of facts that, if true, would establish an egregious Fourth Amendment violation. See Majority Op., ante, at 13.

The majority attempts to limit Cotzojay to its facts by noting that an evidentiary hearing was warranted in that case because the "deliberate, nighttime, warrantless entry into an individual's home, without consent and in

9

the absence of exigent circumstances," is "appalling under any standard." Majority Op., <u>ante</u>, at 8 (internal quotation marks omitted). While Fourth Amendment protections are "at their zenith in the home," <u>Cotzojay</u>, 725 F.3d at 181, at the prima facie stage, a petitioner need not aver "appalling" facts, but simply facts that, taken as true, could establish an egregious Fourth Amendment violation.

Cotzojay affirmed the principle that the egregiousness inquiry "is intended to be broad," <u>id</u>. at 182, and thus emphasizes that egregious Fourth Amendment violations may come in many forms. The majority's attempt to impose an even more stringent standard at the prima facie stage, therefore, is inconsistent with this Court's precedent.[3]

IV

As I have explained, if the purposes underlying the prima facie case requirement are to be respected, a party seeking suppression must do more than swear to facts that simply call into question the constitutionality of the agents'

---

[3] The majority appears to suggest that an egregious Fourth Amendment violation must "shock the conscience." Majority Op., <u>ante</u>, at 7. To the extent that this language may be read to require conduct as flagrant as that in <u>Rochin v. California</u>, 342 U.S. 165 (1952), that conclusion is also inconsistent with our precedent. <u>Cotzojay</u>, 725 F.3d at 181.

conduct. These petitioners have done so. The affidavits submitted by the petitioners and the 27 exhibits attached thereto, taken as true, strongly suggest that their arrests were without plausible legal grounds and may well have been based on their ethnicity, national origin, and status as day laborers.[4]

It is not apparent to me on what basis the police and ICE agents undertook to arrest petitioners. Generally, "it is not a crime for a removable alien to remain present in the United States." Arizona v. United States, 132 S.Ct. 2492, 2505 (2012). Thus, "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." Id. In any event, there is no suggestion in this record that either the undercover officer or the arresting officers in the parking lot knew anything at all about any of the petitioners who entered the car other than that they were willing to engage in casual labor (and,

---

[4] I cannot agree with the majority's suggestion that the exhibits attached to the affidavits may not be considered. See Majority Op., ante, at 14. The Federal Rules of Evidence do not apply in removal proceedings. See, e.g., Aslam v. Mukasey, 537 F.3d 110, 114 (2d Cir. 2008). Even if some of the exhibits might be excluded as hearsay under a strict application of those rules, there is no basis in law or logic to ignore evidence relevant to petitioners' prima facie case, thereby further stultifying the purposes of the burden-shifting framework. It is only by ignoring these exhibits that the panel can assert that "the dissent leaves out a lot." Majority Op., ante at 25. Rather, the majority "leaves out a lot" when it fails to note that the assertion that "aliens with Warrants of Removal would be encountered in Kennedy Park," which comes from the Danbury Police Department's Special Investigations Division, J.A. 5, does not appear to be supported by any specific record evidence.

11

presumably, that they appeared Hispanic). Moreover, neither the government nor the majority has identified a single traffic ordinance – let alone any more serious criminal law – that these petitioners might have been suspected of violating.[5] It therefore appears that prior to their arrest and interrogation, the arresting officers did not have any reasonable basis to suspect that petitioners had violated any state, federal, or local law, the bare minimum required for a lawful seizure. See Terry v. Ohio, 392 U.S. 1, 27 (1968). Surely such a seizure could be regarded as "without plausible legal ground," Cotzojay, 725 F.3d at 182, and thus trigger the need for an evidentiary hearing.[6]

                                           V

     The panel majority opinion seeks to avoid that obvious conclusion on at least two separate but related grounds. The majority contends that petitioners were "self-selected" for arrest first, because they entered the undercover vehicle

---

[5] To the extent that the government suggests that some persons soliciting day labor at Kennedy Park engaged in violations of traffic laws, such as jaywalking, in the absence of a record based on an evidentiary hearing, there is certainly no evidence that any or all of these petitioners committed any such violations.

[6] Whether the Fourth Amendment seizure occurred when petitioners (who voluntarily entered the vehicle), were transported to a location and for a purpose to which they manifestly had not consented, or when they were handcuffed in the abandoned parking lot is immaterial, since the officers and agents knew nothing more at the latter point than they did when petitioners entered the car.

12

without duress, and second because they were members of a targeted group that was "assembled to offer themselves for day labor, an occupation that is one of the limited options for workers without documents," and is "likely correlated with undocumented status." Majority Op., ante, at 10-11. I cannot agree.

The contention that the petitioners were "self-selected" – which attempts to avoid the implication that they were targeted by the authorities on an impermissible basis – ignores the evidence that ethnic prejudice may have played a role in the decision to target Kennedy Park. Petitioners offer evidence that the City of Danbury engaged in a campaign of harassment against Hispanic immigrants in the years prior to the operation, and that the police specifically targeted the Ecuadorian immigrants who gathered at Kennedy Park, as opposed to the mostly Brazilian workers gathered at Minas Carne. To hold that law enforcement officials can target a specific area on the basis of improper considerations such ethnicity and national origin, and then suggest that particular individuals selected themselves for arrest by engaging in lawful conduct is to condone ethnic harassment.

Moreover, petitioners "selected" themselves from others gathered in the park only by volunteering to accept an implicit offer of employment. They

13

neither volunteered themselves for arrest nor engaged in any illegal activity. I reject the notion that the solicitation of day labor in itself gives rise to a reasonable suspicion of illegal presence in the country. The panel offers no empirical support for its assertion that anyone who offers to engage in casual or "off-the-books" work is likely to be an undocumented immigrant. And in any event, a mere statistical correlation between entirely unsuspicious, lawful behavior and some form of illegal activity does not give rise to individualized reasonable suspicion or probable cause.

The solicitation of work is in itself constitutionally-protected speech. See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 945 (9th Cir. 2011) (en banc), citing Intl' Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 677-78 (1992); see also Loper v. N.Y.C. Police Dep't, 999 F.2d 699, 704 (2d Cir. 1993) (holding that begging is a form of constitutionally protected-speech). Moreover, when combined with its "self-selection" theory, the majority's rule admits of no apparent limiting principle, and could subject citizens and aliens in any number of occupations to indiscriminate seizure based on nothing more than their occupational status. Would any person seeking to mow someone's lawn be subject to seizure, on the theory that undocumented

14

workers commonly seek such labor? Any person who seeks work as either an in-home or hotel domestic? Dishwashers or busboys at restaurants? Any person holding a sign that says "Iraq Veteran: Will Work for Food"?

Of course, it is not difficult to imagine the de facto limiting principle that will be utilized. It is hard to imagine immigration officers detaining and questioning a blond, stringy-haired young man of vaguely Euro-American appearance in an Army surplus jacket simply because he carried such a sign. But if the man were short, dark-complected, black-haired, and looked to the officer vaguely Latino, the calculus might well change. Petitioners contend that this is exactly what led the officials planning the Danbury sting to target Kennedy Park.

The majority's apparent response to those questions is that in the immigration context such seizures would be permissible so long as law enforcement displayed no "race-based animus." Majority Op., <u>ante</u>, at 15. (As I have already explained, given the majority's disregard for the proper application of the burden-shifting framework, it is difficult to know how any such race-based animus could ever be proved.) Further, the majority appears to suggest that such seizures would be entirely permissible if they were based on factors such as apparent ethnicity or national origin, combined with the general experience of

15

local police officers. See Majority Op., ante, at 15 (asserting that race is the only "grossly improper consideration" posited in Almeida-Amaral).

Aside from its irreconcilability with Cotzojay's express conclusion that whether a seizure was based on ethnicity is a relevant factor in the egregiousness inquiry, 725 F.3d at 182, the suggestion that ethnicity can be a factor that, in combination with the solicitation of casual employment, supports rather than undermines the legality of police detention is dangerous. Tolerating arrests on such a basis puts all citizens and legal residents who appear to police officers or immigration agents to share a national origin with a large number of undocumented immigrants at grave risk. Whatever criteria law enforcement officials might use to guess a person's ethnic background by casual visual inspection, legal residents and citizens of Latin American origin will likely bear the brunt of that risk.

The majority's attempt to distinguish between "race" on the one hand, and ethnicity and national origin on the other utterly fails. Worse, it appears to condone ethnically-targeted enforcement campaigns based on generalized

16

notions of physical appearance and cultural stereotypes.[7]  I have little trouble concluding that ethnically-based targeting of day laborers constitutes an "egregious" constitutional violation.  Immigration enforcement that is based not on individualized suspicion but on ethnic generalizations teeters on the verge of "the ugly abyss of racism."  Korematsu v. United States, 323 U.S. 214, 233 (1944) (Murphy, J., dissenting).

The majority states that its tolerance for such broad-brush generalizations is necessary, because without it, law enforcement officials would be forbidden from conducting "raids on sweatshops, forced brothels, and other settings in which illegal aliens are exploited and threatened – and much worse."  Majority Op., ante, at 15.  It is doubtless true that protecting undocumented workers, and any other person, from unsafe and illegal working conditions is a legitimate law enforcement interest, as is enforcing the immigration laws themselves.  But a targeted raid on an establishment where there is concrete evidence that undocumented workers are hired differs from indiscriminate sweeps based on the assumption that *anyone* willing to work for cash on a daily basis (or at least

---

[7] Indeed, in this very case, there is evidence suggesting that local officers specifically targeted backyard volleyball games, in part, because that sport was believed to be popular among Hispanic residents.

17

anyone who looks "foreign" to a police officer or customs agent) is an undocumented immigrant.[8]

# VI

At bottom, the majority's analysis in this case is primarily driven by its fear that "[n]o system of immigration enforcement can run," Majority Op., ante, at 15, where the Government is forced in every removal proceeding to justify the manner in which it obtained its evidence. I do not disagree. It is precisely for that reason that application of the Fourth Amendment's exclusionary rule in the context of removal proceedings is limited to cases of egregiousness, and that proper application of the burden-shifting framework would ensure that the nation's immigration enforcement system would not grind to a halt. But no *fair* system of immigration enforcement can exist where these petitioners, who have plausibly alleged that law enforcement officials have committed egregious

---

[8] The majority contends that my approach would "foreclose altogether the consideration of nationality in immigration enforcement." Majority Op., ante, at 26. Such a view might well be "absurd," id. But the panel attacks a straw man. I do not suggest that the immigration authorities may not investigate particular ethnically-organized groups of smugglers or patterns of illegal immigration from particular countries. But that is not the same thing as targeting one of two otherwise similar groups of potential undocumented workers based on apparent nationality, or utilizing apparent ethnicity as a putative basis for deciding that certain day-laborers are likely to be present illegally.

18

Fourth Amendment violations by conducting targeted enforcement schemes based on grossly improper considerations such as ethnicity, national origin, and day-laborer status are not even permitted an evidentiary hearing. The Fourth Amendment applies to citizens and aliens alike, and if it is to retain its vitality, its basic protections should not be so needlessly and promiscuously diminished. Under the totality of the circumstances in this case, I conclude that the evidence presented here entitled petitioners to an evidentiary hearing. I would therefore grant the petitions for review and remand these cases to the Board of Immigration Appeals with instructions to remand to the Immigration Judge for an evidentiary hearing. I respectfully dissent from the majority's contrary conclusion.